UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TENARIS BAY CITY, INC.; MAVERICK TUBE CORPORATION; IPSCO TUBULARS INC.; TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION; AND TUBOS DE ACERO DE MEXICO, S.A., <br><br>                Plaintiffs, <br><br>   v. <br><br>UNITED STATES, <br><br>                Defendant. | Court No. 23-00002 <br> Before: Unassigned |

**COMPLAINT**

Plaintiffs, Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Tubos de Acero de Mexico, S.A., by and through counsel, bring this Complaint against the United States, and allege as follows:

**DETERMINATION TO BE REVIEWED**

1.  Plaintiffs contest certain aspects of the affirmative final determination issued by the U.S. International Trade Commission ("Commission") in the antidumping duty ("AD") investigation involving oil country tubular goods ("OCTG") from Mexico. The contested determination was published in the *Federal Register* as *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, 87 Fed. Reg. 69,331 (Nov. 18, 2022) ("Final Determination"). The corresponding AD order issued by the Department of Commerce ("Commerce") was published in the *Federal Register* on November 21, 2022. *See Oil Country Tubular Goods from Argentina, Mexico, and the Russian Federation: Antidumping Duty Orders and Amended Final Affirmative Antidumping Duty Determination for the Russian Federation*, 87 Fed. Reg. 70,785 (Nov. 21, 2022) ("AD Order").

1

## JURISDICTIONAL STATEMENT

2. This Court has exclusive jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), which confers on the U.S. Court of International Trade jurisdiction to review final determinations issued by the Commission under Section 516A(a)(2)(A)(i) and (B)(i) of the Tariff Act of 1930, as amended (the "Act") (19 U.S.C. § 1516a(a)(2)(A)(i) and (B)(i)). Plaintiffs have complied with the notice requirements of 19 U.S.C. § 1516a(g)(3)(B).

## NAME AND STANDING OF PLAINTIFFS

3. Plaintiffs in this action are Tenaris Bay City, Inc., Maverick Tube Corporation, and IPSCO Tubulars Inc. (collectively, "Tenaris USA"), producers in the United States of the domestic like product; Tenaris Global Services (U.S.A.) Corporation ("TGS USA"), a United States importer of subject merchandise; and Tubos de Acero de Mexico, S.A. ("TAMSA"), a foreign producer and exporter of subject merchandise. Plaintiffs are interested parties, as defined in 19 U.S.C. § 1677(9)(A) and (C), who actively participated in the investigation that resulted in the contested determination. Plaintiffs therefore are entitled to commence this civil action pursuant to 28 U.S.C. § 2631(c) and 19 U.S.C. § 1516a(d).

## TIMELINESS OF THIS ACTION

4. The AD Order for OCTG from Mexico was published in the *Federal Register* on November 21, 2022. *See* 87 Fed. Reg. 70,785. Because Mexico is a free trade area country, Plaintiffs were required to notify the Commission and relevant parties of their intent to commence judicial review within 20 days of publication of the AD Order. *See* 19 U.S.C. § 1516a(g)(3)(B). Plaintiffs filed and then served the notice of intent to commence judicial review on all interested parties, including the Commission, the United States Secretary of the USMCA Secretariat, and the Mexico Secretary of the TMEC Secretariat, on December 8, 2022, which is within the 20-day period. *See* Letter from White & Case LLP to Sec'y Desai and Sec'y Espinosa re: *Oil Country Tubular Goods from*

*Argentina, Mexico, Russia, and South Korea: Final Determinations of the U.S. International Trade Commission – Notice of Intent to Commence Judicial Review* (Dec. 8, 2022). The time limit to commence an action before this Court began to run on December 19, 2022, the 31st day after the publication of the Final Determination in the *Federal Register*. *See* 19 U.S.C. § 1516a(a)(5). Plaintiffs commenced this action by filing a summons with this Court on January 4, 2023, which is timely because it was filed after December 19, 2022.[1] *See* 19 U.S.C. § 1516a(a)(2)(A); 19 U.S.C. § 1516a(a)(5). In accordance with 19 U.S.C. § 1516a(a)(2)(A), Plaintiffs timely filed this Complaint on January 13, 2023, within 30 days after filing of the Summons.

## STANDARD OF REVIEW

5. This Court reviews final determinations issued by the Commission pursuant to 19 U.S.C. § 1673d to determine whether they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## STATEMENT OF FACTS

6. On October 6, 2021, petitioners Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("USW"), and Welded Tube USA, Inc. (collectively, "Petitioners") filed petitions with the Commission and Commerce for the imposition of antidumping duties and countervailing duties ("CVD") on OCTG from Argentina (AD), Mexico (AD), Korea (CVD), and Russia (AD/CVD). The Commission instituted investigations the same day, notice of which was published in the *Federal Register* on October 13, 2021. *See Oil Country Tubular Goods From Argentina, Mexico, Russia, and South Korea: Institution of Anti-Dumping and Countervailing Duty Investigations and Scheduling of*

---

[1] Plaintiffs note that they had filed a summons on Friday, December 16, 2022 to contest the Final Determination. *See* Court No. 22-00345, Summons, ECF No. 1 (Dec. 16, 2022). Because that summons was filed with this Court one business day earlier than set out in the statute and instead should have been filed with this Court on or after Monday, December 19, 2022, Plaintiffs are not filing a complaint in Court No. 22-00345. *See* 19 U.S.C. § 1516a(a)(5).

3

*Preliminary Phase Investigations*, 86 Fed. Reg. 56,983 (Oct. 13, 2021).

7. The Commission preliminarily determined on November 22, 2021 that there was a "reasonable indication that an industry in the United States is materially injured by reason of imports of oil country tubular goods from Argentina, Mexico, Russia, and South Korea." *See Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, 86 Fed. Reg. 67,491 (Nov. 26, 2021).

8. On May 4, 2022 Commerce issued a preliminary affirmative less-than-fair-value ("LTFV") determination with respect to OCTG from Mexico. *See Oil Country Tubular Goods From Mexico: Preliminary Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures*, 87 Fed. Reg. 28,808 (May 11, 2022).

9. In the CVD investigation of OCTG from Korea, Commerce preliminarily determined that countervailable subsidies were not being provided to producers and exporters of the subject merchandise and calculated a zero or *de minimis* rate for all individually examined producers and exporters. *See Oil Country Tubular Goods from the Republic of Korea: Preliminary Negative Countervailing Duty Determination and Alignment of Final Determination with Final Antidumping Duty Determination*, 87 Fed. Reg. 14,248 (March 14, 2022).

10. Commerce's final LTFV determination was published as *Oil Country Tubular Goods From Mexico: Final Affirmative Determinations of Sales at Less Than Fair Value and Critical Circumstances*, 87 Fed. Reg. 59,041 (Sept. 29, 2022).

11. In its final determination for OCTG from Korea, Commerce applied adverse facts available ("AFA") to find that SeAH Steel Corporation ("SeAH") had received a countervailable benefit from a performance guarantee program, and calculated a final countervailable subsidy rate of 1.33 percent. *Oil Country Tubular Goods From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 87 Fed. Reg. 59,056, 59,057 (Dep't Commerce Sept. 29, 2022), accompanying Issues

4

and Decision Memorandum at Comment 11.[2] Commerce continued to calculate a *de minimis* subsidy rate of 0.25 percent for the other mandatory Korean respondent, Hyundai Steel Company ("Hyundai"), in the final determination. *See* 87 Fed. Reg. 59,057. Commerce established the "all others" rate of 1.33, effectively extending to all other Korean exporters the finding that SeAH failed to cooperate to the degree that warranted AFA. *See* 87 Fed. Reg. 59,057.

12. Following the collection of questionnaire data by the Commission's staff, the submission of prehearing briefs from interested parties, a public hearing before the Commission, and the submission of posthearing briefs and final comments from interested parties, the Commission voted in the affirmative with respect to subject imports from Argentina, Mexico, Russia, and South Korea on October 26, 2022. The Commission's consolidated views are published in *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea*, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final), USITC Pub. 5381 (November 2022) ("Views of the Commission").

13. The statute requires the Commission to determine whether a United States industry is materially injured, or threatened with material injury, "by reason of imports" of the subject merchandise. 19 U.S.C. § 1673d(b)(1). The statute provides at 19 U.S.C. § 1677(7) that the Commission must consider three factors in making an injury determination: (I) the volume of imports of the subject merchandise; (II) the effect of such imports on prices in the United States for domestic like products; and (III) the impact of such imports on domestic like products. 19 U.S.C. § 1677(7)(B)(i). The Commission may also consider "such other economic factors as are relevant to the determination." 19 U.S.C. § 1677(7)(B)(ii).

14. A distinctive feature of the record before the Commission in these investigations was Tenaris' domestic (United States-based) production. The evidence before the Commission demonstrated that

---

[2] SeAH attempted to provide information during the verification, subsequent to the issuance of the preliminary determination, relating to a performance guarantee they had used for non-subject merchandise sold before the POI. Commerce rejected the documentation as untimely new factual information. *See* Issues and Decision Memorandum at Comment 11. An appeal contesting Commerce's AFA decision is currently pending before this Court. *See SeAH Steel Corporation v. United States*, Court No. 22-00338.

Tenaris was the largest U.S. producer of OCTG.  *See* Letter from White & Case LLP to Sec'y Commission, re: *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final): Prehearing Brief* at 7-9 and Exhibits 1-12 (Sept. 15, 2022) ("Tenaris Prehearing Brief").  A significant step toward becoming the largest U.S. producer was Tenaris' acquisition of TMK IPSCO in January 2020, which coincided with a sharp downturn in OCTG consumption and therefore OCTG production activity among all U.S. producers.  Tenaris Prehearing Brief at 8, 17, 26; *see also* Letter from White & Case LLP to Sec'y Commission, re: *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final): Posthearing Brief* at Exhibit 1, Question #8 (Sept. 30, 2022) ("Tenaris Posthearing Brief").  The acquisition was proximate in time to the onset of the COVID-19 pandemic.  Tenaris Prehearing Brief at Exhibit 8.  As a result of these and other conditions of competition discussed below, OCTG consumption and then U.S. production activity fell significantly, and the domestic industry (including the largest producer, Tenaris) faced significant economic challenges.  These challenges directly affected the economic indicators (such as employment, capacity utilization, profitability, etc.) that are central to the Commission's injury analysis.

15. Another critical fact before the Commission was that Tenaris offered its U.S. customers one price for each OCTG product regardless of whether the OCTG was imported or produced in Tenaris' U.S. production facilities.  Tenaris Prehearing Brief at 15, Exhibit 60; Tenaris Posthearing Brief at 11; *see also* Letter from White & Case LLP to Sec'y Commission, re: *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea, Inv. Nos. 701-TA-671-672 and 731-TA-1571-1573 (Final): Final Comments* at 2 (Oct. 24, 2022) ("Tenaris Final Comments").  Thus, in analyzing the impact of "subject imports" on the "domestic industry," this investigation would require the Commission to distinguish between the impact of Tenaris' domestically-produced and imported OCTG.

16. In evaluating volume, the Commission must consider whether the volume of subject imports, or any increase in that volume, is "significant," either in absolute terms or relative to domestic production or consumption. 19 U.S.C. § 1677(7)(C)(i). In evaluating price, the Commission must consider whether there has been significant underselling by the subject imports in comparison with domestic like products, and whether imports significantly depress prices or prevent price increases that otherwise would have occurred. 19 U.S.C. § 1677(7)(C)(ii). And in evaluating impact, the Commission must evaluate "all relevant economic factors which have a bearing on the state of the industry," such as, *inter alia*, output, market share, profits, productivity, inventories, and wages. 19 U.S.C. § 1677(7)(C)(iii). These factors must be evaluated "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii).

17. The Commission stated: "After finding *de minimis* subsidy rates for the two individually examined South Korean respondents (Hyundai Steel and SeAH Steel) during the preliminary phase of the investigations, Commerce calculated a *de minimis* rate for only Hyundai Steel in its final determination and so disregarded subsidies to Hyundai Steel in determining countervailing duties.… Thus, OCTG imports from this firm are not subject to these investigations, and Commission staff have accordingly adjusted the import data by *** while other in-scope imports from South Korea are classified as subject imports." Views of the Commission at 4 n.9 (citation omitted). The Commission's Staff Report, however, includes data that reflects both subject imports from Korea and nonsubject imports from Hyundai even though the Commission recognized these nonsubject imports must be excluded. For example, the Staff Report states that certain data relied on in the Commission's cumulation analyses include nonsubject imports from Hyundai. *See, e.g.*, Views of Commission at 22, IV-33-34; *Id.* at 22, IV-34-39. The Staff Report also does not separate qualitative information regarding subject and nonsubject imports from Korea collected from U.S. purchasers, U.S. producers and U.S. importers. *See, e.g.*, Views of Commission at II-33, II-35-44.

18. Plaintiffs argued in their submissions in the underlying final investigations before the Commission that subject imports from Argentina and Mexico should not be cumulated with subject imports from South Korea and Russia because of limited competition between such imports. Plaintiffs explained that subject imports from Argentina and Mexico (seamless OCTG) were not fungible with the subject imports from Korea (primarily welded OCTG). Tenaris Prehearing Brief at 35-38; Tenaris Posthearing Brief at 6-7, Exhibit 23; Tenaris Final Comments at 8. In addition, Tenaris provided evidence to support different channels of distribution, with subject OCTG from Argentina and Mexico sold mainly to end users using Tenaris' unique Rig Direct® program, and subject OCTG from Korea and Russia sold mainly to distributors. Tenaris Prehearing Brief at 39-40; Tenaris Posthearing Brief at 6-8 and Exhibit 1, Question #12; Tenaris Final Comments at 8. Tenaris and TMK also explained that competition with subject imports from Russia was significantly limited as a result of measures taken in response to Russian's invasion of Ukraine, including U.S. sanctions targeting Russia, the Russian producers' inability to obtain API certification, and the revocation of Russia's PNTR status. *See, e.g.*, Tenaris Prehearing Brief at 40; Tenaris Posthearing Brief at Exhibit 1, Question #1; Letter from Winton & Chapman PLLC to Sec'y Commission, re: *Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea: TMK's Post-Hearing Brief* at 2-8 (Sept. 29, 2022).

19. The Commission considered subject imports from Argentina, Mexico, Russia, and South Korea on a cumulated basis, finding that the domestic like product and subject imports from each country were fungible with each other, were sold through overlapping channels of distribution and in overlapping geographical areas, and were simultaneously present in the market throughout almost the entire period of investigation ("POI"). Views of the Commission at 19-23.

20. Regarding conditions of competition during the POI, Plaintiffs provided supporting evidence showing that demand fell to an historic low following the Russia-Saudi Arabia oil supply war and COVID-19 pandemic, but started to recover in August 2020 and through the final phase of the

investigations, as evidenced by rig count, OCTG prices, and domestic producers' statements and performance indicators. Tenaris Prehearing Brief at 16-18, 20-23 and Exhibits 15-16, 26-35; Tenaris Posthearing Brief at 3-4; Tenaris Final Comments at 9. Plaintiffs also provided evidence to support the significant supply constraints due to factors such as pandemic-era shutdowns, distributors' inventory overhang, high prices for hot-rolled coil ("HRC"), and labor shortages. Tenaris Prehearing Brief at 23-33 and Exhibits 36-55; Tenaris Posthearing Brief at 4-5 and Exhibit 1, Question #14; Tenaris Final Comments at 9. Further, they explained that geopolitical events like the Russian invasion of Ukraine further exacerbated fluctuations in the OCTG market. Tenaris Prehearing Brief at 18-20 and Exhibits 17-25. Under these market conditions, Plaintiffs explained that they imported OCTG only as needed to complement domestic production. Tenaris Prehearing Brief at 12-14; Tenaris Posthearing Brief at Exhibit 1, Question #16. Plaintiffs provided record evidence explaining the benefits of Tenaris' innovative Rig Direct® model and demonstrating that Tenaris sells OCTG at one price, regardless of origin, and stating that, as the largest United States producer, it is not in Tenaris' interests to take action that would harm the domestic industry or undermine its own significant investments, totaling more than $10 billion, in the United States. Tenaris Prehearing Brief at 7-12, 15 and Exhibits 1-13; Tenaris Final Comments at 1-2, 13. Plaintiffs also explained that the Canadian International Trade Tribunal ("CITT"), noting that Tenaris was both a Canadian producer and an importer of Mexican OCTG, determined that any injury to the Canadian industry could not be attributed to imports because the record established that Tenaris competed against the rest of the Canadian industry with both imports and domestically-produced OCTG. Finding that it was not possible to separate the impact of Tenaris' imports from Tenaris' domestically-produced OCTG, the CITT concluded that the Canadian industry was experiencing "intra-industry competition" that could not be attributed to subject imports and made a negative injury determination regarding OCTG from Mexico. *See* Tenaris Prehearing Brief at 6, 61-62 (citing *Oil Country Tubular Goods*, Canadian International Trade Tribunal Finding, Inquiry No. NQ-2021-004 (26 January 2022), and

accompanying Statement of Reasons (10 February 2022) (recognizing that Tenaris is one of the largest OCTG producers in Canada, offered its OCTG to the Canadian market at one price regardless of origin, and that: "the injury was primarily the result of intra-industry competition, the downturn in the Canadian OCTG market and the destocking of inventory by independent distributors.")).

21. Regarding volume, the Commission found that the volume of cumulated subject imports was "significant in absolute terms and relative to consumption in the United States." Views of the Commission at 33. Plaintiffs identified errors in data compiled by the Staff related to the accuracy of the market share data in the Commission's Staff Report that were acknowledged in the Staff Report in Note to Table V-18 at V-40.

22. Regarding price effects, the Commission found that cumulated subject imports "significantly undersold the domestic like product." Views of the Commission at 39. Plaintiffs presented evidence showing that their contracts specify a single price for domestically-produced OCTG and imported OCTG products at the time of the contract, which could create an inaccurate comparison with market prices at the time of delivery. Tenaris Prehearing Brief at 53; Tenaris Posthearing Brief at Exhibit 1, Question #7; Tenaris Final Comments at 13-14. Plaintiffs therefore proposed a quarterly lag in the price comparison methodology to account for the timing differences and align with market prices, and argued for other adjustments to the pricing comparisons. Tenaris Prehearing Brief at 54 and Exhibit 63; Tenaris Posthearing Brief at Exhibit 1, Question #10. The Commission rejected Tenaris' price lag methodology and its implications for purported underselling data. The Commission concluded that underselling led to the domestic industry's decrease in market share, but did not reach a conclusion as to whether domestic producers would have been able to increase their prices in the absence of subject imports. Views of the Commission at 36-39.

23. Finally, the Commission concluded that subject imports "had a significant impact on the domestic industry." Views of the Commission at 47. The Commission observed that the domestic industry's performance significantly weakened during the global market collapse, and subsequently

showed only minimal improvement when consumption rebounded.  The Commission described the same pattern affecting indicia for domestic industry output, capacity utilization, employment, inventories, and financial performance: decline from 2019 to 2020, improvement from 2020 to 2021, and significant improvement in interim 2022.  The Commission concluded that any weak domestic industry performance could be causally linked to subject imports, and any industry improvements could be attributed to the filing of the OCTG petitions.  *See* Views of the Commission at 43 ("We find a causal nexus between cumulated subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021 . . . {and w}e find it instructive that the domestic industry was able to improve its performance markedly in interim 2022 compared to interim 2021 after the filing of the petitions{.}").

24. On November 21, 2022, Commerce's antidumping and countervailing duty orders were published in the *Federal Register*.  *See* 87 Fed. Reg. 70,782, 70,785.

25. On December 13, 2022, SeAH filed a summons and complaint with this Court challenging Commerce's decision in its final determination to apply AFA to SeAH.  *See SeAH Steel Corporation v. United States*, Court No. 22-00338, Summons and Complaint, ECF Nos. 1, 4 (Dec. 13, 2022).

## STATEMENT OF CLAIMS

### COUNT ONE:  CUMULATION

26. Plaintiffs hereby incorporate by reference paragraphs 6 through 25 of this Complaint.

27. The Commission failed to address properly the record evidence supporting a decision not to cumulate, which demonstrated stark differences in the way that subject imports from Argentina and Mexico competed in the U.S. OCTG market compared to subject imports from Korea and Russia.  Subject imports from Korea were mainly welded OCTG sold to distributors, whereas subject imports from Argentina and Mexico consisted of seamless OCTG controlled by TGS USA and primarily sold to end users using long-term contracts as part of Rig Direct®.  Certain data and qualitative information relied on by the Commission for its cumulation analysis included both subject imports

11

from Korea and nonsubject imports from Hyundai in Korea, even though the Commission recognized that OCTG imports from Hyundai are not subject to these investigations. Moreover, the Commission's decision to include all subject imports from Korea rather than only the imports of SeAH in the cumulated injury analysis is improper given that Commerce calculated an AFA rate only for SeAH. The Commission also included OCTG imports from Korea in its cumulated analysis notwithstanding the fact that OCTG imports from Korea should not have been included because they were already subject to an existing AD order (and subject to a separate CVD investigation). With respect to subject imports from Russia, the record evidence showed that sanctions and other measures to address the Russian invasion of Ukraine posed significant barriers to Russian OCTG entering the U.S. market.

28. Accordingly, the Commission's determination to conduct a cumulated injury analysis is not supported by record evidence and is inconsistent with 19 U.S.C. §§ 1677(7)(G) and 1677(7)(C)(iii).

## COUNT TWO: CONDITIONS OF COMPETITION

29. Plaintiffs hereby incorporate by reference paragraphs 6 through 25 of this Complaint.

30. The Commission failed to evaluate properly the arguments and evidence on the record regarding the conditions of competition. The Commission failed to consider properly the record evidence regarding the remarkable conditions of competition that characterized the OCTG market during the POI, and arguments that to the extent the domestic injury was harmed, it was the result of these conditions and not subject imports. Such conditions include the dramatic decline in demand and prices for OCTG caused by the Saudi/Russian oil supply dispute and the COVID-19 pandemic; high inventory levels of OCTG held by distributors; high prices for HRC, the major input for welded OCTG production; and OCTG supply constraints, including labor shortages. The Commission's cursory discussion of supply and demand considerations did not properly address the record evidence, including industry statements and market data. *See* Views of the Commission at 27-28. Moreover, the Commission failed to address the record evidence that Tenaris sold to U.S. customers

through its unique Rig Direct® program at one price, regardless of whether the OCTG was produced at Tenaris' U.S. mills or imported from Argentina or Mexico. The Commission also failed to address the record evidence regarding Tenaris' significant investments in the U.S. industry that support a finding that Tenaris, as the largest U.S. OCTG producer, would not injure the domestic industry.

31. The Commission's failure to evaluate "all relevant economic factors… within the context of the business cycle and conditions of competition that are distinctive to the affected {OCTG} industry" is inconsistent with 19 U.S.C. § 1677(7)(C)(iii). Accordingly, the Commission's determination that material injury to the domestic industry was "by reason of imports" is unsupported by record evidence and contrary to law.

## COUNT THREE: VOLUME

32. Plaintiffs hereby incorporate by reference paragraphs 6 through 25 of this Complaint.

33. In 19 U.S.C. § 1677(7)(C)(i), the statute provides that the "Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." Because the Commission ignored the record evidence regarding conditions of competition, including high demand for OCTG and tight U.S. supply conditions after the recovery began, its finding that the volume and increase in the volume of subject imports was significant in absolute terms and relative to consumption in the United States is unsupported by substantial evidence. Separately, the Commission's decision to consider the volume of all subject imports from Korea except for those of Hyundai based on an AFA rate for only one company, SeAH, is not in accordance with law.

34. In 19 U.S.C. § 1677(7)(I), the statute directs the Commission to consider whether "any change in the volume, price effects, or impact of imports of the subject merchandise since the filing of the petition in an investigation … is related to the pendency of the investigation{.}" Contrary to its practice, as upheld by this Court, the Commission decided to discount post-petition data in its volume analysis even though the record demonstrated that the post-petition volume of subject imports

13

was higher in interim 2022 than in interim 2021, confirming that the petition did not result in a decline in the volume of subject imports. The Commission ignored the increase in volume and instead relied only on a decrease in the market share of subject imports from 2021 to 2022. This determination to discount post-petition data and ignore that the volume of subject imports increased from interim 2021 to 2022, at the same time that the domestic industry's financial performance improved, is not in accordance with law.

## COUNT FOUR: PRICE

35. Plaintiffs hereby incorporate by reference paragraphs 6 through 25 of this Complaint.

36. In 19 U.S.C. § 1677(7)(C)(ii), the statute requires that, in evaluating the effect of subject imports on domestic prices, the Commission "shall consider whether— (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree."

37. The Commission rejected Tenaris' price lag methodology, and Tenaris' arguments regarding other adjustments required to the pricing comparisons, which demonstrated limited underselling when prices were adjusted to reflect the fact Tenaris products were sold pursuant to long-term contracts with prices set by formula, and instead relied on the price comparisons in the Staff Report without any adjustments. The Commission's approach ignores the record evidence that the price comparisons that include Tenaris products are distortive without adjustments, and is not supported by substantial evidence.

38. The Commission's reliance on the lost sales and lost revenue information on the record provided by Petitioners and the Commission's failure to address the contrary record evidence, including information regarding purchasers' preferences and purchasing factors, together with information and arguments submitted by Tenaris rebutting Petitioners' lost sales and lost revenue

information, is not supported by substantial evidence.

39. Separately, given the instances where the data and qualitative information relied on by the Commission for its cumulation analysis included both subject imports from Korea and nonsubject imports from Hyundai in Korea even though the Commission recognized that OCTG imports from Hyundai are not subject to these investigations, to the extent the Commission relied on information regarding nonsubject imports, its analysis of price effects is not in accordance with law. Moreover, the Commission's decision to consider the price effects of all subject imports from Korea except for those of Hyundai based on an AFA rate for only one company, SeAH, is not in accordance with law.

40. The Commission stated that it did not reach a conclusion regarding price suppression. *See* Views of the Commission at 39 ("Given the significant underselling and the market share shift, we do not reach a conclusion as to whether the domestic producers would have been able to further increase prices to a significant degree than they did but for subject imports"). The Commission's failure to reach a decision is contrary to the statutory requirement to address price suppression. In fact, the record evidence demonstrated that the domestic industry's COGS-to-net sales ratio and the increase in OCTG prices during the POI correlated with the conditions of competition during the POI rather than subject imports and supported a finding of no price suppression. Moreover, the Commission ignored record evidence that Table V-18 at V-39-40 of the Staff Report is flawed, including Commission Staff's Note at V-40 recognizing the potential double counting of volumes in Table V-18, and, therefore, cannot be relied on as evidence of market share shifts from a purchaser perspective. The Commission's failure to make a determination finding no price suppression and its reliance on Table IV-18 is not in accordance with law and is not supported by substantial evidence.

## COUNT FIVE: IMPACT AND CAUSATION

41. Plaintiffs hereby incorporate by reference paragraphs 6 through 25 of this Complaint.

42. Pursuant to 19 U.S.C. § 1677(7)(C)(iii), the Commission is required to "evaluate all relevant economic factors which have a bearing on the state of the {OCTG} industry in the United States…

within the context of the business cycle and conditions of competition that are distinctive to the affected {OCTG} industry." The Commission failed to properly address the arguments and evidence on the record regarding economic factors, including demand and supply conditions, that support non-attribution of injury to subject imports. The Commission failed to properly consider the record evidence regarding the conditions of competition that characterized the OCTG market during the POI, and arguments that to the extent the domestic injury was harmed, it was the result of these conditions and not subject imports. Such conditions include the dramatic decline in demand and prices for OCTG caused by the Saudi/Russian oil supply dispute and the COVID-19 pandemic; high inventory levels of OCTG held by distributors; high prices for HRC, the major input for welded OCTG production; and OCTG supply constraints, including labor shortages. In addition, the Commission ignored evidence concerning intra-industry competition, including the role of Tenaris' RigDirect® program and "one-price" policy for imports and domestically-produced OCTG and Tenaris' significant investment in its U.S. operations that are part of the domestic industry that is purportedly "injured" by Tenaris' imports from Argentina and Mexico. The Commission failed to properly address evidence that distinctive conditions of competition contributed to domestic industry performance. The Commission also disregarded data on the record demonstrating that domestic industry performance was improving at the end of the POI, and erroneously attributed the positive industry performance to the effects of the filing of the petitions. The Commission also inappropriately relied on qualitative information that included both subject imports from Korea and nonsubject imports from Hyundai in Korea, even though the Commission recognized that OCTG imports from Hyundai are not subject to these investigations.

43. The Commission's failure to "evaluate all relevant economic factors… within the context of the business cycle and conditions of competition that are distinctive to the affected {OCTG} industry" is inconsistent with 19 U.S.C. § 1677(7)(C)(iii). Separately, the Commission's failure to properly address the arguments and evidence on the record regarding "other factors" that were the

cause of any harm to the domestic industry is also inconsistent with 19 U.S.C. § 1677(7)(B)(ii). Accordingly, the Commission's determination that material injury to the domestic industry was "by reason of imports" is inconsistent with 19 U.S.C. § 1673d(b)(1) and is not supported by record evidence and contrary to law.

### COUNT SIX: EVALUATION OF CONTRARY EVIDENCE

44. Plaintiffs hereby incorporate by reference paragraphs 6 through 25 of this Complaint.

45. The Commission failed to properly consider the probative value of the evidence that contradicted or detracted from the evidence presented by Petitioners or that was compiled by the Commission staff regarding cumulation, conditions of competition, volume, price, and impact. The record evidence, taken together, regarding cumulation, conditions of competition, volume, price, and impact supports the conclusion that any harm experienced by the domestic industry was caused by other factors, and not by subject imports from Argentina and Mexico. The Commission's determination that the domestic industry was materially injured is not supported by record evidence. Nor is the Commission's determination that the domestic industry was materially injured "by reason of imports" supported by record evidence.

### PRAYER FOR RELIEF

Wherefore, for the foregoing reasons, Plaintiffs request that this Court:

(a) Hold that the Commission's Final Determination is unsupported by substantial evidence and otherwise not in accordance with law;

(b) Remand the Final Determination to the Commission with instructions to issue a new determination that is consistent with the Court's decision; and

(c)  Provide such other and further relief as this Court deems just and proper.

                Respectfully submitted,

                /s/ Gregory J. Spak
                Gregory J. Spak
                Frank J. Schweitzer
                Kristina Zissis
                Matthew W. Solomon
                Danica Harvey

                WHITE AND CASE LLP
                701 Thirteenth Street, NW
                Washington, DC 20005
                (202) 626-3600

                *Counsel for Tenaris Bay City, Inc., IPSCO Tubulars Inc., Maverick Tube Corporation, Tenaris Global Services (U.S.A.) Corporation, and Tubos de Acero de Mexico, S.A.*

Date: January 13, 2023