Slip Op. 25-78

## UNITED STATES COURT OF INTERNATIONAL TRADE

TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, IPSCO TUBULARS INC., TENARIS GLOBAL SERVICES (U.S.A.) CORPORATION, AND SIDERCA S.A.I.C.,

      Plaintiffs,

and

TMK GROUP AND TUBOS DE ACERO DE MEXICO, S.A.,

      Consolidated Plaintiffs,

and

TENARIS BAY CITY, INC., MAVERICK TUBE CORPORATION, AND IPSCO TUBULARS INC.,

      Plaintiff-Intervenors,

v.

UNITED STATES,

      Defendant,

and

Before: Jennifer Choe-Groves, Judge

Consol. Court No. 22-00344

> **UNITED STATES STEEL CORPORATION, BORUSAN MANNESMANN PIPE U.S. INC., PTC LIBERTY TUBULARS LLC, UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, AND WELDED TUBE USA INC.,**
>
> **Defendant-Intervenors.**

## OPINION AND ORDER

[Sustaining the U.S. International Trade Commission's affirmative material injury determination resulting from the investigation involving oil country tubular goods from Argentina, Mexico, Russia, and South Korea.]

Dated:  June 20, 2025

Gregory J. Spak, Frank J. Schweitzer, Kristina Zissis, and Cristina M. Cornejo, White and Case, LLP, of Washington, D.C., for Plaintiffs Tenaris Bay City, Inc., Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de Acero de Mexico, S.A.  Colin A. Dilley, Luca Bertazzo, Matthew W. Solomon, and Ron Kendler also appeared.

Michael J. Chapman, Jeffrey M. Winton, and Amrietha Nellan, Winton & Chapman PLLC, of Washington, D.C., for Consolidated Plaintiff TMK Group.  Vi Mai, Ruby Rodriguez, and Jooyoun Jeong also appeared.

Dominic L. Bianchi, General Counsel, Andrea C. Casson, Assistant General Counsel for Litigation, and Madeline R. Heeran, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., for Defendant United States.

Thomas M. Beline, Myles S. Getlan, James E. Ransdell, and Nicole Brunda, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for Defendant-Intervenor United States Steel Corporation.

Roger B. Schagrin, Jeffrey D. Gerrish, and Luke A. Meisner, Schagrin Associates, of Washington, D.C., argued for Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United Steel, Paper, and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc.  Christopher T. Cloutier, Elizabeth J. Drake, Justin M. Neuman, Nicholas J. Birch, Saad Y. Chalchal, and William A. Fennell also appeared.

Choe-Groves, Judge:  Before the Court is the remand determination from the final affirmative material injury investigation of oil country tubular goods ("OCTG") from Argentina, Mexico, Russia, and South Korea by the U.S. International Trade Commission ("Commission" or "ITC").  Views of the Commission on Remand ("Remand Views"), USITC Pub. 5381, Inv. Nos. 701-TA-671–72, 731-TA-1571–73 (Final) (Aug. 16, 2024), PR 181R; see also Oil Country Tubular Goods from Argentina, Mexico, Russia, and South Korea, 87 Fed. Reg. 69,331 (ITC Nov. 18, 2022) ("Final Determination"), PR 169; see also Views of the Commission, USITC Pub. 5381, Inv. Nos. 701-TA-671–72, 731-TA-1571–73 (Final) (Nov. 18, 2022), PR 165[1] ("Views"); Final Staff Report (Oct. 14, 2022), PR 161 ("Staff Report").

Consolidated Plaintiff TMK Group, Plaintiffs Tenaris Bay City, Inc.,

---

[1]  Citations to the administrative record reflect the public administrative record ("PR") and the confidential administrative record ("CR").  ECF Nos. 59, 92.

Maverick Tube Corporation, IPSCO Tubulars Inc., Tenaris Global Services (U.S.A.) Corporation, and Siderca S.A.I.C., and Consolidated Plaintiff Tubos de Acero de Mexico, S.A. (collectively, "Plaintiffs") challenge certain aspects of the final affirmative material injury determination, such as the Commission's determinations of cumulation, volume, price effects, and impact, which were included in the Rule 56.2 motions for judgment on the agency record filed by TMK Group and Tenaris. Pl.'s Rule 56 Mot. J. Agency R. Pursuant USCIT Rule 56.2 ("TMK Group's Motion"), ECF No. 42; Rule 56 Mot. J. Agency R. ("Tenaris' Motion"), ECF No. 46; see also Mem. Supp. Pl.'s Rule 56.2 Mot. J. Agency R. ("TMK Group's Br."), ECF No. 42-1; Mem. Points Authorities Supp. Pls.' Rule 56.2 Mot. J. Agency R. ("Tenaris' Br."), ECF No. 46. Defendant-Intervenors Borusan Mannesmann Pipe U.S. Inc., PTC Liberty Tubulars LLC, United States Steel Corporation, United Steel, Paper, and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA Inc. (collectively, "Defendant-Intervenors") filed their response. Def.-Intervs.' Rule 56.2 Resp. Br. ("Def.-Intervs.' Resp."), ECF No. 50. Defendant United States ("Defendant" or "the Government") filed its Memorandum in Opposition to Plaintiff's Rule 56. 2 Motion for Judgment on the Agency Record. Def.'s Mem. Opp'n Pl.'s Rule 56.2 Mot. J. Agency R. ("Def.'s Resp."), ECF No. 52. TMK Group and Tenaris filed their reply briefs. Reply

Supp. Pls.' Rule 56.2 Mot. J. Agency R. ("Tenaris' Reply"), ECF No. 56; Reply

Br. TMK Group ("TMK Group's Reply"), ECF No. 57.

The Court remanded the <u>Final Determination</u> and deferred its review of the

ITC's determinations on volume, price effects, and impact in the material injury

determination.  <u>See</u> <u>Tenaris Bay City, Inc. v. United States</u> ("<u>Tenaris I</u>"), 48 CIT

__, 698 F. Supp. 3d 1287 (2024).  On remand, the Commission continued to adopt

its determinations on the conditions of competition, volume, price effects, and

impact from the original <u>Views</u>.  <u>Remand Views</u> at 3.  The <u>Remand Views</u> solely

addressed the cumulation issue.

TMK Group and Tenaris filed their comments in opposition to the <u>Remand</u>

<u>Views</u>.  Pls.' Cmts. USITC's Remand Redetermination ("Tenaris' Remand

Cmts."), ECF Nos. 80, 81; Cmts. TMK Group Opp'n [ITC]'s Remand

Redetermination ("TMK Group's Remand Cmts."), ECF Nos. 82, 83.  Defendant

and Defendant-Intervenors filed their comments in support.  Def. [USITC]'s Cmts.

Remand Redetermination ("Def.'s Remand Cmts."), ECF Nos. 86, 87; Def.-

Intervs.' Cmts. Supp. Remand Results ("Def.-Intervs.' Remand Cmts."), ECF Nos.

89, 90.

For the following reasons, the Court sustains the Commission's <u>Final</u>

<u>Determination</u>.

# BACKGROUND

The Court presumes familiarity with the underlying facts and procedural history of this case and recites the facts relevant to the Court's review of the Remand Views.  See Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1292.

Petitions requesting investigations were filed with the U.S. Department of Commerce ("Commerce") and the ITC on October 6, 2021 by Borusan Mannesmann Pipe U.S., Inc., PTC Liberty Tubulars LLC, U.S. Steel Tubular Products, Inc., the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC, and Welded Tube USA, Inc.  Petitions, PR 1.

The Commission initiated an investigation and determined preliminarily that there was a reasonable indication that the domestic industry was materially injured or threatened with material injury by reason of subject imports.  Views of the Commission (Preliminary) ("Preliminary Views"), PR 74.

The Commission published its Final Determination on November 18, 2022, determining that an industry in the United States was materially injured by reason of imports of OCTG from Argentina, Mexico, Russia, and South Korea.  See Final Determination, 87 Fed. Reg. at 69,331.

The Court sustained in part and remanded in part the Final Determination. The Court sustained the ITC's determination to cumulate subject imports from

Argentina and Mexico as supported by substantial evidence, but remanded the

ITC's determination to cumulate subject imports from Russia and subject and non-

subject imports from South Korea as unsupported by substantial evidence.  Tenaris

I, 48 CIT __, 698 F. Supp. 3d at 1309.  The Court remanded for the Commission to

reconsider its cumulation determinations for subject imports from Russia and non-

subject imports from South Korea, and deferred its analysis of the challenges to the

ITC's additional determinations regarding volume, price effects, and impact in the

material injury determination.  Id., at __, 698 F. Supp. 3d at 1301, 1307, 1309.

The Commission published a notice of remand proceedings on May 29,

2024, and issued supplemental tables concerning imports from South Korea on

June 7, 2024.  Oil Country Tubular Goods from Argentina, Mexico, and Russia, 85

Fed. Reg. 46,419 (May 29, 2024) (notice of remand proceedings); USITC Suppl.

Mem. (June 7, 2024), PR 174R, CR 440R.  The Parties filed comments in response

to the notice of remand proceedings.  TMK Group's Remand Cmts., PR 176R;

Tenaris' Remand Cmts., PR 177R, CR 442R.

The Commission issued its Remand Views on August 16, 2024.  See

Remand Views.  Oral argument was held on March 17, 2025.  Oral Arg. (Mar. 17,

2025), ECF No. 100.

## ISSUES PRESENTED

The Court reviews whether the Commission's determinations of cumulation of subject imports, volume, price effects, and impact are supported by substantial evidence and in accordance with law.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i), which grant the Court authority to review actions contesting the ITC's final injury determinations following an antidumping or countervailing duty investigation. The Court will hold unlawful any determination found to be unsupported by substantial record evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); see also Siemens Energy, Inc. v. United States, 806 F.3d 1367, 1369 (Fed. Cir. 2015).

## DISCUSSION

Tenaris and TMK Group challenge certain aspects of the Commission's final affirmative material injury determination. TMK Group challenges only the Commission's cumulation analysis as unsupported by substantial evidence and not in accordance with law, whereas Tenaris challenges the Commission's cumulation, volume, price effects, and impact determinations as unsupported by substantial evidence and not in accordance with law. See TMK Group's Br.; Tenaris' Br. The

Government and Defendant-Intervenors contend that the Commission's material injury determination is supported by substantial evidence and in accordance with law in all aspects of the affirmative determination.  See Def.'s Resp.; Def.-Intervs.' Br.

To make an affirmative material injury determination, the ITC must find that: (1) material injury existed; and (2) the material injury was caused by reason of the subject imports.  See Swiff-Train Co. v. United States, 793 F.3d 1355, 1359 (Fed. Cir. 2015) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997)).  Material injury is defined by statute as harm that is not inconsequential, immaterial, or unimportant.  19 U.S.C. § 1677(7)(A).  To determine whether a domestic industry has been materially injured or threatened with material injury by reason of unfairly subsidized or less than fair value imports, the Commission considers:

> (I)    the volume of imports of the subject merchandise,
>
> (II)   the effect of imports of that merchandise on prices in the United States for domestic like products, and
>
> (III)  the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States.

Id. § 1677(7)(B)(i).  The Commission may consider other economic factors that are relevant to determining whether there is material injury by reason of

imports.  Id. § 1677(7)(B)(ii).  No single factor is dispositive and the significance

to be assigned to a particular factor is for the ITC to decide.  See S. Rep. No. 96-

249, at 88 (1979), reprinted in 1979 U.S.C.C.A.N. 381, 474.  The statute neither

defines the phrase "by reason of," nor provides the ITC with guidance, on how to

determine whether the material injury is by reason of subject imports.  The U.S.

Court of Appeals for the Federal Circuit ("CAFC") has interpreted the statutory

language "by reason of" to require the Commission to consider the volume of

subject imports, their price effects, their impact on the domestic industry, and to

establish whether there is a causal connection between the imported goods and the

material injury to the domestic industry.  See Swiff-Train Co., 793 F.3d at

1361; see also S. Rep. No. 96-249, at 57–58, 74–75 (1979), reprinted in 1979

U.S.C.C.A.N. 381, 443–44, 460–61.

## I.    The Commission's Cumulation of Subject Imports

The Commission cumulated subject imports from Argentina, Mexico,

Russia, and South Korea, determining that the cumulation factors of fungibility,

channels of distribution, geographic overlap, and simultaneous presence in the

market showed a "reasonable overlap of competition" among subject imports and

the domestic like product.  Views at 16–23.  On remand, the Commission

continued to adopt its determinations on the conditions of competition, volume,

price effects, and impact from the original Views.  Remand Views at 3.

### A.    Legal Standard

In evaluating material injury, the Commission must "cumulatively assess the volume and effect of imports of the subject merchandise from all countries," if such imports compete with each other and with domestic like products.  19 U.S.C. § 1677(7)(G)(i)(I), (II).  The ITC refers to this requirement as "cumulation."  The Statement of Administrative Action to the Uruguay Round Agreements Act ("SAA") states that the statutory requirement is satisfied if there is a reasonable overlap of competition.  See Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 848 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4190.  Because the Commission need only find that a "reasonable overlap" of competition exists, a finding of "'complete overlap' of competition" is not required to support a cumulation decision.  Mukand Ltd. v. United States, 20 CIT 903, 909, 937 F. Supp. 910, 916 (1996) (quoting Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50, 52 (1989)); see also Goss Graphics Sys., Inc. v. United States, 216 F.3d 1357, 1362 (Fed. Cir. 2000) (stating that the ITC's inquiry is "whether 'reasonable overlap' of competition exists").

To determine whether imports compete with each other and with the domestic like product, or if there is a "reasonable overlap" of competition, the Commission analyzes four factors:

(1)    the degree of fungibility between subject imports from different countries and between subject imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

(2)    the presence of sales or offers to sell in the same geographic markets of subject imports from different countries and the domestic like product;

(3)    the existence of common or similar channels of distribution for subject imports from different countries and the domestic like product; and

(4)    whether the subject imports are simultaneously present in the market

Int'l Indus., Ltd. v. United States, 42 CIT __, __, 311 F. Supp. 3d 1325, 1329–30 (2018) (citation omitted).

The Commission's use of these criteria for determining whether competition exists between and among subject imports and the domestic like product have been approved by the U.S. Court of International Trade ("CIT") and the CAFC. See Goss Graphics Sys., Inc. v. United States, 22 CIT 983, 985, 33 F. Supp. 2d 1082, 1085 (1998), aff'd sub nom., 216 F.3d 1357 (Fed. Cir. 2000); see also Fundicao Tupy S.A. v. United States, 12 CIT 6, 10–11, 678 F. Supp. 898, 902 (1988) (summarizing the factors as "the fungibility and similar quality of the imports, the similar channels of distribution, the similar time period involved, and the geographic overlap of the markets"), aff'd, 859 F.2d 915 (Fed. Cir. 1988).  No

one factor in the Commission's analysis is dispositive.  Noviant OY v. United States, 30 CIT 1447, 1461, 451 F. Supp. 2d 1367, 1379 (2006).

The Commission must "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry" when considering the impact of subject imports on the domestic industry.  19 U.S.C. § 1677(7)(C)(iii).  The ITC's determinations regarding competition and market conditions must be supported by substantial record evidence.  See 19 U.S.C. § 1615a(b)(1)(B)(i); see also Siemens Energy, Inc., 806 F.3d at 1369.  When the Commission makes a determination on volume, price, or impact that is premised on speculation about industry conditions, that determination has not been "evaluate[d] . . . within the context of the business cycle and the conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C)(iii); see also Catfish Farmers of Am. v. United States, 37 CIT 717, 733 (2013) ("[S]peculation does not amount to reasonable inference, as it provides no factually-grounded basis for sustaining an agency's determination.").

### B.    OCTG from Russia

In Tenaris I, the Court remanded the ITC's determination to cumulate subject imports from Russia as not supported by substantial evidence or in accordance with law due to: (1) the ITC's timeframe for evaluating cumulation; (2)

the ITC's failure to consider potentially contrary evidence on the record for its

cumulation determination; and (3) the ITC's failure to file the Responses to

Commission Questions with the Court.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at

1298.

### 1.     Timing of Assessment

In their Rule 56.2 motions, Tenaris and TMK Group challenged the ITC's

cumulation of subject imports from Russia, arguing that the ITC's determination

was not in accordance with law because the timeframe for evaluating cumulation

of Russian OCTG was improper and vote day should have been the appropriate

timeframe to assess conditions of competition.  See TMK Group's Br. at 5–25;

Tenaris' Br. at 8–23.

In both the Views and Remand Views, the ITC cumulated Russian OCTG

based on the period of investigation, explaining on remand that the assessment of

competitive overlap for cumulation purposes should not be made at the time of the

Commission's vote.  Remand Views at 11–17.  The Commission clarified that

Commerce, rather than the Commission itself, determined that subject imports

from the four countries at issue were unfairly traded before the time of the

Commission's vote on October 26, 2022, and contended that Chaparral Steel Co. v.

United States ("Chaparral Steel"), 901 F.2d 1097 (Fed. Cir. 1990), was

distinguishable from this case, and relied on Steel Auth. of India, Ltd. v. United

States ("Steel Authority of India" or "SAIL"), 25 CIT 472, 478, 146 F. Supp. 2d

900, 906–07 (2001) in its cumulation determination.  Id.

    Tenaris contests the ITC's reliance on Steel Authority of India because the

case was dependent on Chevron, U.S.A., Inc. v. Natural Resources Defense

Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and argues

that the Court must instead independently interpret the term "compete with" in 19

U.S.C. § 1677(7)(G)(i) under Loper Bright Enters. v. Raimondo ("Loper Bright"),

603 U.S. 369, 144 S. Ct. 2244 (2024).  Tenaris' Remand Cmts. at 11–15.[2]  Tenaris

contends that the ITC's interpretation of the statute and its cumulation analysis

continue to be inconsistent with the plain meaning of the statutory phrase "compete

with," which uses the present tense and thus denotes that the subject imports

_____

[2]  Defendant contends that the Parties' argument regarding Loper Bright is waived
under the doctrine of administrative exhaustion because Tenaris did not raise this
argument in its administrative remand comments filed prior to the issuance of
Loper Bright.  See Tenaris' Remand Cmts.  Parties are excused from the
exhaustion requirement when an intervening judicial decision materially affects an
issue before the Court.  See Siemens Gamesa Renewable Energy v. United States,
621 F. Supp. 3d 1337, 1348 (2023) (citing Hormel v. Helvering, 312 U.S. 552,
558–59 (1941)); Gerber Food (Yunnan) Co. v. United States, 33 CIT 186, 196, 601
F. Supp. 2d 1370, 1380 (2009); cf. Papierfabrik Aug. Koehler AG v. United States,
36 CIT 1632, 1635 (2012) ("the intervening judicial decision exception applies
because there was a change in the controlling law on the use of zeroing").  Tenaris'
argument is not waived because Loper Bright is an intervening judicial decision
that would "materially alter the result" of the case.  See Gerber Food (Yunnan)
Co., 33 CIT at 196, 601 F. Supp. 2d at 1380.

should be evaluated during the months leading up to and including vote day.  Id. at 7.

During oral argument, however, Plaintiffs apparently abandoned their argument that vote day should be the proper timeframe of assessment, framing the issue instead as greater weight that the ITC should have accorded to the last few months of the period of investigation when sanctions were imposed against Russian imports and prevented reasonable competition with other subject imports. Oral Arg. at 2:00:00–2:00:31 ("Just to be clear, we are not asking to change the [period of investigation].  We are asking the Court to consider whether the Commission reasonably determined present material injury during the [period of investigation].").  Because Plaintiffs no longer assert that vote day is the appropriate time for assessing competition of imports, the Court focuses here on the assessment of competition through the end of the period of investigation rather than vote day.

Under Loper Bright, courts exercise their "independent judgment" about the correctness of an agency's statutory interpretation. See Lashify, Inc. v. Int'l Trade Comm'n, 130 F.4th 948, 957 (Fed. Cir. 2025) (citing Loper Bright, 603 U.S. at 412).  Previously, under Chevron deference, "ambiguous" statutes were treated as "implicit" delegations of authority to agencies, which had authority to "fill any gap[s]" in the statute with "reasonable" interpretations.  Chevron, 467 U.S. at 843–

44 (quotation omitted).  However, Loper Bright held that statutory ambiguity "is

not a delegation to anybody," and courts should not "defer" to an agency's

interpretation when faced with an unclear statute.  Loper Bright, 603 U.S. at 400.

The statutory language is the starting point for analysis and typically

controls the outcome.  See, e.g., Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469

U.S. 189, 194 (1985).  At issue is the "compete with" provision in section

1677(7)(G)(i).  See 19 U.S.C. § 1677(7)(G)(i) (stating that the ITC may cumulate

subject imports to determine material injury "if such imports compete with each

other and with domestic like products in the United States market").

The Court must "use[] every tool at their disposal to determine the best

reading of the statute and resolve the ambiguity [in the statute]."  Loper Bright,

603 U.S. at 373.  The Court must apply "all relevant interpretative tools" to

determine which meaning is best—"'the reading the court would have reached' if

no agency were involved."  Id.

Section 1677(7)(G)(i) states:

For purposes of clauses (i) and (ii) of subparagraph (C), and subject to
clause (ii), the Commission shall cumulatively assess the volume and
effect of imports of the subject merchandise from all countries with
respect to which—

(I)     petitions were filed under section 1671a(b) or 1673a(b) of
        this title on the same day,

> (II)   investigations   were   initiated   under section 1671a(a) or 1673a(a) of this title on the same day, or
>
> (III)   petitions were filed under section 1671a(b) or 1673a(b) of this title and investigations were initiated under section 1671a(a) or 1673a(a) of this title on the same day,
>
> if such imports compete with each other and with domestic like products in the United States market.

19 U.S.C. § 1677(7)(G)(i).

Section 1677(7)(G)(i) is silent as to the precise time period that the Commission must consider in making its cumulation determination.  The phrase "compete with" is not defined, with the only statutory mandate to cumulate subject imports in cases when "imports compete with each other and with domestic like products" in the United States market.  19 U.S.C. § 1677(7)(G)(i).  What Congress intended by the phrase "compete with," or the timeframe that the Commission may use to assess competition, is also not immediately clear from the legislative history of section 1677(G)(i), which was first added to the law in the Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 612, 98 Stat. 2948, 3033.[3]  Cumulation was mandated "for purposes of assessing injury if such imports compete with each other and with like products of domestic industry in the U.S. market."  House

---

[3]  This provision was added as clause (i) to Paragraph (7)(C).  Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 612(a)(2)(A).

Comm. on Ways and Means, Trade Remedies Reform Act of 1984, H.R. Rep. No. 98–725, at 37 (1984), reprinted in 1984 U.S.C.C.A.N. 5127, 5134.

Congress did not include statutory language regarding the timeframe that the Commission should use for its cumulation analysis in the Customs and Trade Act of 1990. See Customs and Trade Act of 1990, Pub. L. No. 101-382, § 224(a); Uruguay Round Agreements Act, Pub. L. No. 103-465, § 222(b)(2) & (e)(2). The legislative history only includes guidance that cumulation is designed to take into account "simultaneous unfair imports." Neither the statutory language nor the legislative history conclusively establishes the intended time frame in which imports are to be considered for competition in the cumulation analysis.

As noted in Tenaris I, the statutory language is written in the present tense: if "such imports compete with each other and with domestic like products in the United States market." 19 U.S.C. § 1677(7)(G)(i). The Court reiterates that conditions of competition must exist in the present tense at the end of the investigation. It is not enough for the conditions of competition to have existed at some point during the period of investigation. The Court also concludes that the statutory language does not support Plaintiffs' contention that the ITC should accord greater weight to the conditions of competition at the end of the period of investigation. The Court also considers the present tense of the word "compete with." "Compete" in the context of firms is defined as each firm "tr[ying] to get

people to buy its own goods in preference to those of the other firm or country."

Collins Dictionary, Merriam-Webster Dictionary, available at

https://www.collinsdictionary.com/us/dictionary/english/compete (last visited June

20, 2025).  For there to be competition, subject imports from competing countries

must be evaluated under similar circumstances and in the present tense at the end

of the investigation.

On remand, the Commission explained that it made its determination based

on the entire period of investigation.  In light of Plaintiffs' abandonment of the

argument that the conditions of competition should exist on vote day, and the lack

of statutory support for the argument that the ITC was required to weigh the

conditions of competition more heavily at the end of the period of investigation

due to the sanctions imposed against Russia, the Court concludes that the ITC's

assessment of competition throughout the 42-month period of investigation was in

accordance with law.

The Commission's determination that imports from Russia "compete with

each other and with domestic like products" within the meaning of Section 771 of

the Tariff Act of 1930, as amended, and its review of Russian OCTG in the United

States market for its material injury determination is reasonable.

Therefore, the Court sustains the ITC's determination on the issue of imports

from Russia competing with each other and with domestic like products.

## 2.    Cumulation Factors

TMK Group challenged the ITC's cumulation determination as not

supported by substantial evidence, arguing that all four cumulation factors were

not met because: (1) the loss of American Petroleum Institute ("API")-certification

for Russian subject imports rendered subject imports not fungible with other

subject imports; and (2) the sanctions imposed on Russia (aside from the loss of

API-certification) and Section 232 duties affected subject Russian OCTG from

sharing simultaneous presence, channels of distribution, and geographic overlap

with other subject imports.  See TMK Group's Br. at 6–24.

Regarding the fungibility of Russian OCTG, the ITC first acknowledged that

the impact of loss of API-certification "is not yet clear, particularly in light of

continued subject imports from Russia after March 2022."  Views at 23.  The

Court noted that this statement seemed contradictory because it showed that the

ITC was not clear about the impact from such a loss, but proceeded to predict and

discuss the effect of this sanction.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at

1298.

The Court remanded for the ITC to further explain "the lag of the sanction

measures taking place or the impact of the loss of API-certification services on

Russian OCTG's competitiveness" and "the potential contrary evidence regarding

the competitiveness of imports from Russian OCTG relative to the other subject

imports from Argentina, Mexico, and South Korea." Id. at 1301.

On remand, the ITC clarified that the suspension of API-certification did not

render Russian OCTG non-fungible with domestic and imported OCTG, as the loss

of API-certification did not prevent Russian green tube from being fungible and

competing with domestic or imported green tube, either in limited-service

environments or after being processed in the United States, because the quality of

Russian OCTG remained competitive despite lacking certification.  Remand Views

at 28–35.

The ITC addressed the "potentially contrary evidence" previously cited by

TMK Group in its Rule 56.2 brief regarding the competitiveness of Russian

OCTG, such as the hearing testimony of Luca Zanotti, President of Tenaris USA,

and a letter from the API.  See Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1299;

Remand Views at 30–35.  The ITC explained on remand that Zanotti's testimony

that the suspension of API-certification services would be a "major setback for

Russia" did not reflect the actual views of domestic and global purchasers on this

issue as it was Zanotti's own personal assumptions, and the API letter in its

entirety demonstrated that Russian OCTG would still be competitive when sold in

the United States because the products' quality would not decline despite the lack

of certification.  See Remand Views at 30–35.  The ITC also addressed the

testimony of Adam Lange, Vice President of Drilling for Tap Rock Operating,
which the ITC explained was evidence showing that the quality of Russian OCTG
would not be affected by the loss of certification and would continue to remain
competitive in the United States market.  See Tenaris' Remand Cmts. at 12; TMK
Group's Remand Cmts. at 8; Remand Views at 32–33 (citing USITC Hearing Tr.
at 249–50, PR 136).

The ITC cited to additional evidence on remand demonstrating that API-
certification was not the sole consideration for purchasers when qualifying
suppliers or assessing the quality of OCTG, especially when Russian OCTG was
produced to API specification.  Remand Views at 30–35 (citing Staff Report at
Table II-12; Blank U.S. Importer Questionnaire (June 14, 2022) at III-22, III-25,
PR 92)).  For example, the ITC cited Table II-12, which showed the number of
purchasers' responses regarding the ability of suppliers to meet minimum quality
specifications and indicated that a majority of responding purchasers reported that
Russian OCTG "always" or "usually" met minimum quality specifications.  Id. at
30–35 (citing Staff Report at II-30).  The Court agrees that this evidence
demonstrates that purchasers believed that Russian OCTG were able to meet
minimum qualification specifications, with or without API-certification.

Regarding the simultaneous presence of Russian OCTG in the United States
market due to the imposition of sanctions, the ITC addressed the Court's concern

that the Views did not accurately reflect the effects of sanctions, given the alleged

lag of the sanctions taking effect from March 2022 to May 2022 on Russian

subject imports.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1299.  On remand, the

Commission explained that the sanctions did not prevent subject Russian OCTG

from being simultaneously present in the United States market during the period of

investigation, including the post-invasion months.  Remand Views at 26–39 (citing

Staff Report at Tables IV-18, C-1, C-2, and G-4).

The ITC cited Tables IV-18, C-1, C-2, and G-4 to demonstrate that subject

imports entered the United States market in the second quarter of 2022 in relatively

high volumes, were shipped into the United States market in interim 2022, and

were held in importers' inventory at the end of interim 2022.  Id. (citing Staff

Report at Tables IV-18, C-1, C-2, and G-4).  The ITC cited Table IV-18 to show

monthly United States import data during the entire period of investigation,

January 2019 through June 2022.  Id. (citing Staff Report at IV-34–IV-37).  The

ITC cited Table IV-18 to support its determination that OCTG from Russia were

imported in February 2022, March 2022, and May 2022.  Id. (citing Staff Report at

IV-35).  There is no import data for April 2022 and June 2022.  Id.  The ITC cited

Table C-1 to show summary data concerning the United States market, by item and

period, and Table C-2 to show summary data concerning the United States market,

excluding one United States producer, by item and period.  Id. (citing Staff Report

at App'x C).  The ITC cited Table G-4 to show the domestic importers' shipments

of imports from Russia into the United States, by end-finish and grade, with

quantity in short tons.  Id. (citing Staff Report at G-12).  The Court agrees with the

ITC that this evidence shows that subject Russian imports entered the United

States market in the second quarter of 2022 in higher volumes than they did in the

first half of 2021.  Id.

Referring to the specific sanctions on Russian OCTG, the ITC explained

that: (1) the Section 232 duties were in place since 2018; (2) the combination of the

Section 232 duties and the suspension of the API-certification (as of March 17,

2022) did not prevent Russian OCTG from entering into the United States in

March 2022 in volumes that were 69% higher than in March 2021; and (3) these

sanctions, together with the revocation of Russia's MFN status (as of April 18,

2022) and ban on Russian ships from entering United States ports (as of April

2022) did not prevent Russian OCTG from entering the domestic market in May

2022 in volumes 25% higher than in May 2021.  Id. at 37–38.  The ITC explained

that the combined volume of subject imports from Russia was 47.5% higher in

March and May 2022, after the imposition of these sanctions, than in March and

May 2021.  Id.

The Court concludes that the Commission adequately explained on remand

the impact of the sanctions on Russian OCTG with respect to the cumulation

analysis.  The Court also concludes that record evidence cited by the ITC on remand supports its determination that subject Russian imports remained in the United States market and in the final four months of the period of investigation and did not affect these imports from sharing simultaneous presence, channels of distribution, and geographic overlap with other subject imports.

The ITC complied with the remand instructions for this issue.[4]  The Commission's determination to cumulate Russian OCTG is sustained as in accordance with law and supported by substantial evidence.

### C.    OCTG from South Korea

Plaintiffs challenged the Commission's determination to cumulate OCTG from South Korea as not in accordance  with law and not supported by substantial evidence because the ITC included: (1) non-subject imports from South Korea; and

---

[4]  On remand, the ITC filed the Responses to Commission Questions, which previously was not placed in its in entirety on the record with the Court, only including three pages of the document, pages II-29–II-32, which did not pertain to any information about the loss of API-certification or green tubes.  The ITC cited to the Responses to Commission Questions, stating that the loss of API-certification to Russian OCTG producers would not prevent Russian-produced OCTG from being sold in the United States market with the certification because Russian producers could still send green tubes to API-certified processors and then sell the processed tubes in the United States market.  Id. (citing Petitioners' Post-Hearing Br. (Sept. 29, 2022) at Ex. 1 ("Responses to Commission Questions") at II-55–II-56, PR 143, CR 419).  The Court now observes that pages II-55–II-56 of the document has been filed with the Court.  Resps. Commission Questions at II-55–II-56.

(2) subject imports from South Korea that were under an antidumping order and

not fungible with subject imports from Argentina and Mexico.  See TMK Group's

Br. at 25–26; Tenaris' Br. at 23–24.

### 1.    Exclusion of Non-Subject Imports from South Korea

In their Rule 56.2 motions, Plaintiffs asserted that the Commission's

cumulation determination was not in accordance with law because the ITC's

inclusion of non-subject imports violated 19 U.S.C. § 1677(7)(G)(i) through its

reliance on Tables II-16, II-19, and IV-7 of the Staff Report.  See TMK Group's Br.

at 25–26; Tenaris' Br. at 23–24.

In the original Views, the ITC relied on Staff Report tables that contained

non-subject imports from South Korea and tables for its cumulation determination

for findings of fungibility, geographic overlap, and simultaneous presence in the

market.  The ITC determined that there was a sufficient degree of fungibility

between the subject imports from South Korea and those from Argentina and

Mexico, even though there were differences in the average unit values between

these countries, based on data that showed interchangeability between all subject

imports.  See Views at 27 (citing Staff Report at Tables II-15–II-17).  In addition to

citing Tables II-16, II-19, and IV-17, the ITC cited to Tables II-1, II-15, II-18, and

II-20 to support its cumulation determination.  Id.

Previously, the Court concluded that the ITC's determination to cumulate both subject and non-subject South Korean imports was neither supported by substantial evidence nor in accordance with law.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1307.  The Court remanded the ITC's determination on South Korean OCTG because non-subject imports may not be included in the ITC's cumulation determination.  Id.

On remand, the ITC revised the tables that it had relied on in the Staff Report, issuing a supplemental memorandum with 11 corresponding tables.  Suppl. Mem.  The ITC stated on remand that "nothing in this record indicated that there were meaningful producer-specific differences among imports of OCTG from South Korea," but retabulated data to ensure that it was not including non-subject Hyundai OCTG in its analysis of competitive overlap, which are contained in the Supplemental Tables 1 to 11.  Remand Views at 44.

In its remand brief, Tenaris argues that the original and new tables used by the ITC failed to reliably exclude non-subject imports from South Korea and that reliance on these tables for the ITC's fungibility determination violates the statute and does not comply with the remand order.  Tenaris' Remand Cmts. at 23–32.  Tenaris argues that the ITC could have issued new questionnaires to the purchasers and importers to confirm that they only considered subject imports when responding to the questions.  Id. at 29.

The Government contends that the ITC's remand redetermination with
respect to non-Hyundai imports[5] from South Korea was supported by substantial
evidence and in accordance with law because the ITC stated that the record
evidence did not indicate "meaningful producer-specific differences among
imports of OCTG from South Korea" and respondents had continuously referred to
South Korean imports as a whole, without making a distinction between subject
and Hyundai imports.  Def.'s Remand Cmts. at 24–26.

Defendant-Intervenor asserts that the ITC excluded any data with an
evidentiary basis for suspecting connection to non-subject South Korean OCTG
and the Court should sustain the remand redetermination based on the revised
tables.  Def.-Intervs.' Remand Cmts. at 30–33.

The ITC described the supplemental tables as follows:

Tables 1 and 2 present geographic and monthly official import statistics
adjusted using proprietary, Census edited Customs records to reclassify
imports from Hyundai as "nonsubject imports" (corresponding to CR
Tables II-17 and II-18).  Tables 3 and 5 present importer questionnaire
responses regarding interchangeability and the significance of
differences other than price, and separate and exclude responses by
importer Hyundai (corresponding to CR Tables II-16 and II-19).  Tables
4 and 6 present purchaser questionnaire responses regarding
interchangeability and the significance of differences other than price,
and separate and exclude responses by firms that purchased, or might
have purchased, OCTG imported by Hyundai Steel USA
(corresponding to CR Tables II-17 and II-20).  Tables 7 through 11

---

[5]  The non-subject South Korean imports were from Hyundai's imports.  See
Views.

> present purchaser questionnaire responses comparing 15 characteristics
> of OCTG from South Korea and other sources, and separate and
> exclude responses by firms that purchased, or might have purchased,
> OCTG imported by Hyundai (corresponding to CR Table II-14).

Remand Views at 44 n.191.

The ITC stated that each table in the supplemental memorandum, from the

least stringent exclusion 1 to the most stringent exclusion 3, continued to support

the Commission's original fungibility, geographic overlap, and simultaneous

presence determinations.  Id. at 46.  The ITC explained that the adjustment of data

in the supplemental document "eliminate[d] from the pool of responses

impressions of purchasers who may have had Hyundai's OCTG in mind when

furnishing responses on interchangeability, comparability, and the importance of

non-price factors," and the ITC adjusted geographic and monthly official import

statistics to distinguish between subject imports from South Korea and non-subject

imports from South Korea for its geographic overlap and simultaneous presence

analyses.  Id. at 45 (citing Suppl. Mem., cover note).  The ITC explained that each

exclusion removed from the dataset the responses of domestic purchasers who

reported purchasing South Korean OCTG from Hyundai Steel or a customer of

Hyundai Steel.  Id. at 45 n.193.  For example, Exclusion 1 excluded from the data

set the response of a domestic producer who reported purchasing specifically from

Hyundai Steel in its list of top suppliers in the domestic purchasers' questionnaire response.  Id. at 45.

The ITC explained that "the data for interchangeability, comparability, and the significance of differences other than price show three different permutations, removing to varying degrees responses from U.S. purchasers that reported purchasing from Hyundai, U.S. purchasers that Hyundai reported selling to, or U.S. purchasers that reported purchasing from a distributor who purchased from Hyundai."  Id.

The Court concludes that the ITC reasonably excluded non-subject South Korean imports from its cumulation analysis, based on its further explanations on remand and the record documents that support the ITC's determination.  Therefore, the Court sustains the ITC's cumulation determination with respect to South Korean imports as in accordance with law and supported by substantial evidence.

### 2.    Impact of the Existing Antidumping Order on Subject Imports from South Korea

In their Rule 56.2 motions, Plaintiffs contested the ITC's inclusion of subject merchandise from South Korea that had already been used to support a finding of material injury to the domestic OCTG industry in 2014 in a different proceeding and was subject to an existing antidumping order, which Plaintiffs contended artificially inflated the cumulated volume of imports while adding little or no

impact to the potential harm suffered by the domestic industry.  TMK Group's Br. at 4–5; Tenaris' Br. at 23–24.

The Court remanded the <u>Final Determination</u> as to the cumulation of South Korean imports because the ITC did not address the possible effect resulting from the subject imports from South Korea that were under an antidumping order in its final determination.  <u>Tenaris I</u>, 48 CIT at __, 698 F. Supp. 3d at 1307.

In its remand brief, Tenaris argues that the ITC failed to address the impact of the existing antidumping order as a condition of competition affecting subject imports from South Korea.  Tenaris' Remand Cmts. at 23–32.  Tenaris argues that the ITC did not meaningfully address the disciplining impact of the existing antidumping order as a condition of competition affecting subject imports from South Korea and the ITC's failure to consider the commercial and competitive impact of such an antidumping order arguably rendered the ITC's cumulation determination unsupported by substantial evidence.  <u>Id.</u> at 31–32.

The Government contends that the ITC addressed the effects of the existing antidumping order on subject imports and the Court did not instruct the ITC to consider the impact of the antidumping order.  Def.'s Remand Cmts. at 26.

Defendant-Intervenors assert that the ITC complied with the Court's remand order and the SAA undermines Tenaris' theory regarding the impact of the

antidumping order on the subject imports from South Korea.  Def.-Intervs.'

Remand Cmts. at 33–34.

The Court observes that the ITC addressed on remand the potential impact

of the existing antidumping order on subject imports and explained that its analysis

of the four factors would support its cumulation analysis notwithstanding the

antidumping order.

In the Remand Views, the Commission stated:

As an initial matter we note that, notwithstanding an order remedying
the dumping of OCTG imports from South Korea, Commerce found the
non-Hyundai imports from South Korea to still be unfairly traded
through subsidization at above de minimis levels.  The dumping order
would not address injury resulting from the subsidization of these
imports, and the dumping order is only capable of discipling the level
of dumping not the level of subsidization.  In addition, the existence of
the [antidumping] order did not result in differences in the way these
imports competed in the U.S. market to render cumulation
inappropriate based on the Commission's four cumulation factors.  As
reviewed below, analysis of the four factors used in the Commission
cumulation analysis show that subject imports from South Korea were
fungible with imports from other subject countries, sold in overlapping
channels of distribution and in overlapping geographic markets, and
simultaneously present in the U.S. market.  Furthermore, the record
shows that, even while under the discipline of the [antidumping] order,
subject imports from South Korea *** the domestic like product in the
*** of quarterly price comparisons and Respondents put forward no
evidence in support of their assertion to the contrary.

Remand Views at 52.  Because the ITC adequately discussed the antidumping

order and its effect on the cumulation analysis, it complied with the remand

instructions for this issue.

Accordingly, the ITC's cumulation of OCTG from Russia, South Korea, Mexico, and Argentina is in accordance with law and supported by substantial evidence.[6]

## II.    The Commission's Determinations of Volume, Price Effects, and Impact

To determine whether subject imports caused material injury to a domestic industry in the United States, the Commission considers three statutory factors—the volume of subject imports, the effect of such imports on prices, and the economic impact of subject imports on the domestic industry.  See 19 U.S.C. § 1677(7)(C)(i)–(iii).  Because the Court holds that the Commission's cumulation determination is supported by substantial evidence and in accordance with law, the Court now addresses the additional determinations regarding volume, price effects, and impact in the material injury determination that were not addressed in Tenaris I.  On remand, the Commission continued to make an affirmative material injury determination and adopt its previous determinations on the conditions of

---

[6] Previously, the Court held the ITC's determination to cumulate subject imports from Argentina and Mexico was supported by substantial evidence.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1307–09.

competition, volume, price effects, and impact from the original <u>Views</u>.[7]  <u>See</u>

<u>Remand Views</u> at 3.

Tenaris contends that the Commission failed to conduct its injury analysis

within the context of unprecedented conditions of competition prevailing during

the period of investigation, which led to erroneous volume, price, and impact

determinations.  Tenaris' Br. at 9–17.  Tenaris articulated these conditions of

competition as including: (1) severely reduced demand for petroleum (and

therefore OCTG) resulting from both the Russia/Saudi oil price/supply war and the

global pandemic; (2) market factors suppressing domestic production, including

high inventory levels held by United States distributors, de-stocking of those

inventories, a meteoric rise in prices for hot-rolled coil ("HRC") (the major input

for welded OCTG production), and labor shortages; (3) Tenaris' emergence as the

largest domestic OCTG producer after investment of more than $10 billion in

United States production facilities, including its acquisition of IPSCO during the

period of investigation, that coincided with the period of investigation demand and

supply shocks; (4) Tenaris' innovative approach to domestic supply through its Rig

Direct program, featuring long-term contracts with sales at "one price" bidding in

the United States market, regardless of whether the OCTG was produced at

_____

[7]  The <u>Remand Views</u> solely addressed the cumulation issue on remand, and did
not address the Commission's determinations of volume, price effects, and impact.

Tenaris' domestic mills or imported; and (5) twenty-four consecutive months of

increasing OCTG prices (including for over a year in advance of the filing of the

petition).  See id.

## A.    The Commission's Volume Determination

Tenaris challenges as not in accordance with law the Commission's

determination that the volume of subject imports was "significant in absolute terms

and relative to the consumption in the United States," arguing that the volume of

such imports was not considered significant under the conditions of competition,

which showed that after a historic demand collapse, United States producers could

not supply the surging demand in 2021 and imports were needed.  Tenaris' Br. at

25–30.  Tenaris also contends that the Commission also failed to consider the post-

petition increase in the volume of subject imports (improperly accorded less weight

to post-petition data).  Tenaris' Reply at 6–8.

## 1.    Conditions of Competition

19 U.S.C. § 1677(7)(C)(iii) states that:

In examining the impact required to be considered under subparagraph
(B)(i)(III), the Commission shall evaluate all relevant economic factors
which have a bearing on the state of the industry in the United States,
including, but not limited to—

(I)     actual and potential decline in output, sales, market share, gross
profits, operating profits, net profits, ability to service debt,
productivity, return on investments, return on assets, and
utilization of capacity,

    (II)    factors affecting domestic prices,

    (III)    actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

    (IV)    actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

    (V)    in a proceeding under part II of this subtitle, the magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C)(iii).

Tenaris contends that the Commission's volume analysis must consider conditions of competition in finding subject imports to be "significant," citing to several cases in support of its proposition. Tenaris' Br. at 25–26 (citing Altx, Inc. v. United States, 26 CIT 709 (2002), aff'd, 370 F.3d 1108 (Fed. Cir. 2004); Angus Chem. Co. v. United States, 944 F. Supp. 943 (1996), aff'd, 140 F.3d 1478 (Fed. Cir. 1998); Arlanxeo USA LLC v. United States, 389 F. Supp. 3d 1330 (2019), aff'd, 819 Fed. App'x 925 (Fed. Cir. 2020)); Tenaris' Reply at 5–6 (citing OCP S.A. v. United States, 658 F. Supp. 3d 1297 (2023); OCTAL Inc. v. United States, 539 F. Supp. 3d 1291 (2021)).

Defendant-Intervenors argue that the Commission is not statutorily required to consider the conditions of competition and Tenaris' cited cases are inapplicable for the volume determination analysis.  Def.-Intervs.' Resp. at 24–25.

Defendant interprets Tenaris' argument as requiring the Commission to consider whether subject imports were "needed" and asserts that the Commission can make significance of volume determinations based on the volume data alone.  Def.'s Resp. at 26–27.

The Commission determined that "the volume of cumulated subject imports, and the increase in that volume, are significant in absolute terms and relative to consumption in the United States," and did not address the conditions of competition that were raised by Plaintiffs in its analysis of the volume of subject imports.  See Views at 32–33.

Defendant-Intervenors distinguish between 19 U.S.C. § 1677(7)(C) and 19 U.S.C. § 1677(7)(C)(iii) to argue that conditions of competition are only relevant to the impact analysis, rather than the volume analysis.

> Section 1677(7)(C)(iii) elucidates the economic factors pertaining to the Commission's assessment of the impact on the affected domestic industry and mandates consideration of "conditions of competition" for economic factors within "this clause" (*i.e.*, 1677(7)(C)(iii)), as opposed to "this subparagraph" (*i.e.*, 1677(7)(C)).  This provision was added by the Omnibus Trade and Competitiveness Act of 1988, Pub.L. 100-418, § 1328(2)(C) (1988), and like the statute itself, the conference report makes clear that the "conditions of competition" mandate applied only to the Commission's evaluation of impact.  See H. Conf. Rep. 100-576

(1988) at 617 (subsection c); see also S. Rep. 100-71 (1987) at 117 (describing the "third change" as relating to "examin{ation of} the impact of imports on domestic producers").

Def.-Intervs.' Resp. at 24.

The Court agrees that the last section of 19 U.S.C. § 1677(7)(C)(iii) regarding "conditions of competition" should be read to apply only to the "impact on affected domestic industry" section of the statute. The legislative history expresses Congressional intent that the conditions of competition requirement should apply only to the ITC's evaluation of impact, and the statutory language "relevant economic factors" appears in both the "impact" section and the "conditions of competition" section, supporting the interpretation that these clauses should be read together. The "volume" language in section 1677(7)(C)(i) does not mention "relevant economic factors," supporting the interpretation that the "conditions of competition" requirement was intended to apply only to "impact" and not to "volume."

When the Commission evaluates the volume of imports of merchandise, it must consider "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). Under subsection (iii), which pertains to the impact on the affected domestic industry, the Commission must consider "all relevant economic factors described in this clause

within the context of the business cycle and conditions of competition that are distinctive to the affected industry." Id. § 1677(7)(C)(iii)(V).

Here, the ITC examined whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, was significant, in compliance with 19 U.S.C. § 1677(7)(C)(i). Views at 43. The Court concludes that the ITC's volume determination followed the statutory requirements and was in accordance with law.

The ITC cited record evidence in support of its volume determination, including Tables IV-19 and C-1, showing that cumulated subject import volume in absolute terms increased overall. Id. at 42 (citing Staff Report at Tables IV-19 and C-1). The ITC cited record evidence demonstrating that the volume and the increase in volume of cumulated subject imports were significant relative to United States consumption. Id. at 42–43 (citing Staff Report at Tables IV-19 and C-1). Thus, the Court sustains the ITC's volume determination because it is in accordance with law and supported by substantial evidence.

## 2.    Post-Petition Data

Tenaris argues that the post-petition data provision, 19 U.S.C § 1677(7)(I), only allows for the Commission to discount data based on post-petition changes in import volumes in absolute terms, rather than volume relative to consumption, such as market share. Tenaris' Br. at 27. Tenaris asserts that the Commission's

focus on market share, rather than import volume, led to the discounting of

favorable domestic industry performance data in interim 2022, which was data that

coincided with rising import volumes and changing market conditions to

demonstrate that subject imports were not the cause of harm to the domestic

injury.  Id. at 29.

Defendant and Defendant-Intervenors contend that legislative history does

not support such a strict interpretation of the term "volume" under the post-petition

data provision.  Def.'s Resp. at 27–30; Def.-Intervs.' Resp. at 27–28.  Defendant-

Intervenors contend that the Commission's determination to give less weight to

post-petition market share data was reasonable and comports with 19 U.S.C.

§ 1677(7)(C)(i) and its discretion pursuant to 19 U.S.C § 1677(7)(I).  Def.-Intervs.'

Resp. at 27.

The post-petition data provision states:

The Commission shall consider whether any change in the volume,
price effects, or impact of imports of the subject merchandise since the
filing of the petition in an investigation under part I or II of this subtitle
is related to the pendency of the investigation and, if so, the
Commission may reduce the weight accorded to the data for the period
after the filing of the petition in making its determination of material
injury, threat of material injury, or material retardation of the
establishment of an industry in the United States.

19 U.S.C. § 1677(7)(I) (emphasis added).

Consol. Court No. 22-00344                                              Page 42

Legislative history, specifically the SAA, provides guidance as to the

legislative intent behind 19 U.S.C. § 1677(7)(I):

> Section 222(f) of the bill amends section 771(7) to address the probative
> value of post-petition data by adding section 771(7)(I).   The new
> statutory provision emphasizes that the Commission should consider
> whether changes in the volume of imports, their price effects, and their
> impact on the domestic industry occurring since the filing of the petition
> are related to the pendency of the investigation.  Courts have repeatedly
> recognized that the initiation of antidumping and countervailing duty
> proceedings can create an artificially low demand for subject imports,
> thereby    distorting    post-petition    data    compiled    by    the
> Commission.  See Metallverken Nederland, B.V. v. United States, 744
> F. Supp. 281. 284 (Ct. Int'l Trade 1987); USX Corp. v. United States,
> 655 F. Supp 487, 492 (Ct. Int'l Trade 1987). The imposition of
> provisional duties, in particular, can cause a reduction in import
> volumes and an increase in prices of both the subject imports and the
> domestic like product.   Similarly, improvements in the domestic
> industry's condition during an investigation can be related to the
> pendency of the investigation.
>
> The provision also is intended to make clear that, when the Commission
> finds evidence on the record of a significant change in data concerning
> the imports or their effects subsequent to the filing of the petition or the
> imposition of provisional duties, the Commission may presume that
> such change is related to the pendency of the investigation.  In the
> absence of sufficient evidence rebutting that presumption and
> establishing that such change is related to factors other than the
> pendency of the investigation, the Commission may reduce the weight
> to be accorded to the affected data.  To the extent that the decision of
> the Court of International Trade in Chr. Bjelland Seafood/A/S v. United
> States, slip op. 92-196 (Ct. Int'l Trade Oct. 23, 1992), could be
> interpreted as requiring the Commission to demonstrate that the change
> is not related to other factors, it is disapproved.

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc.

No. 103-316, vol. 1, at 843 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4186.

Considering the language of the SAA, the Court agrees that if the Commission cannot consider if market share changes are related to the pendency of antidumping and countervailing duty investigations, then the Commission's ability to identify and discount data that have been "distorted" by such investigation would be hindered.  See Def.'s Resp. at 29.

Further, the definition of "volume" under 19 U.S.C. § 1677(7)(C)(i) does not support Plaintiff's interpretation of the statutory intent to restrict the Commission's consideration to absolute volume.  As mentioned above, the Commission evaluates the volume of imports of merchandise and "shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  The post-petition data provision of 19 U.S.C. § 1677(7)(I) only mentions "volume" and does not have any restrictions or limitations, and thus it is reasonable to conclude that the post-petition data statutory provision applies to volume of imports in absolute terms or relative to production or consumption in the United States.  19 U.S.C. § 1677(7)(C)(i); 19 U.S.C. § 1677(7)(I).

Accordingly, the Commission's volume determination followed the statutory requirements in 19 U.S.C. § 1677(7)(C)(i) and 19 U.S.C. § 1677(7)(I) and is in accordance with law.

## B.    The Commission's Price Effects Determination

Tenaris asserts that the Commission's determination that subject imports had significant adverse effects was unsupported by substantial evidence and otherwise not in accordance with law because the Commission did not make a finding regarding price suppression, failed to consider record evidence concerning Petitioners' lost sales and lost revenue claims; and failed to account for price lags resulting from Tenaris' long-term contracts.  Tenaris' Br. at 30–37.

The Government and Defendant-Intervenor argue that the Commission's price effects determination was supported by substantial evidence and in accordance with law.  Def.'s Resp. at 31–38; Def.-Intervs.' Resp. at 28–36.

### 1.    Legal Standard

In evaluating the effect of imports on prices, the statute directs the Commission to consider whether:

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

### 2.    The Commission's Determination

The ITC stated that there is a moderate-to-high degree of substitutability between the domestic like product and cumulated subject imports, <u>Views</u> at 29 (citing Staff Report at Table II-12), and that price is an important factor in OCTG purchasing decisions, among other important factors.  <u>Id.</u> at 33.  The ITC had collected quarterly pricing data from U.S. producers and importers for nine pricing products.  <u>Id.</u> at 34 (citing Staff Report at V-12–V-13).  The Commission determined that "[g]iven the significant underselling and the market share shift, we do not reach a conclusion as to whether the domestic producers would have been able to further increase prices to a significant degree than they did for subject imports."  <u>Id.</u> at 39.

### 3.    Alternative Price Comparison Methodology

In the <u>Views</u>, the ITC addressed Tenaris' argument regarding the possible price lags resulting from Tenaris' long-term contracts.  The ITC rejected Tenaris' argument to adopt an alternative price comparison methodology, which asked the ITC to depart from its normal price comparison and "lag by one quarter" its comparisons of subject import prices to domestic prices, comparing domestic prices in a given quarter to subject imports in the following quarter.  <u>Id.</u>  The record evidence supports the ITC's determination to not apply an alternative methodology.

First, the ITC reasoned that the basis for Tenaris' proposed adjustments to the Commission's quarterly price comparisons would largely be limited to subject imports from Argentina and Mexico, and although these limited subject imports accounted for the vast majority of Tenaris' U.S. shipments of subject imports during the POI, the ITC stated that it must consider the significance of underselling by cumulated subject imports.  Id. at 35 (citing Staff Report at Table III-24).  Table III-24 shows U.S. producers' purchases of imports from subject sources as being mainly Russian OCTG.  Staff Report at III-31.

Second, the ITC asserted that the percentage of Tenaris' U.S. shipments subject to contracts containing a time lag is unclear, even as to subject imports from Argentina and Mexico.  Id. (citing Tenaris' Pre-Hearing Br. at Exh. 63 ("Prusa Analysis"), CR 405, PR 128).  The Prusa Analysis supports the ITC's assertion.  See Prusa Analysis.

Third, the ITC stated that Tenaris' argument wrongly assumes that domestic OCTG is generally sold at spot market prices, allegedly creating the appearance of underselling, when these market prices rose while subject import contract prices remain unchanged for another quarter.  Views at 35 (citing Staff Report at Table V-5).  Table V-5 demonstrates that U.S. producers sold a plurality of their OCTG under short-term contracts, with most of the rest of their sales under long-term contracts or spot sales, and importers sold mostly under long-term contracts,

followed by spot sales, and then short-term contracts.  Staff Report at V-10.  The

ITC stated that a high percentage of the domestic industry's sales were made

pursuant to contracts in 2021, with some including pricing mechanisms similar to

those in Tenaris' contracts.  Views at 35 (citing Petitioners' Post-Hearing Br. at

Exh. 3 ("Declaration of Robert J. Beltz") & Exh. 4 ("Declaration of Brett

Mendenhall")).[8]  Both declarations indicate that there were contracts made in 2021

in the domestic industry.  Decl. Robert J. Beltz; Decl. Brett Mendenhall.

Fourth, the ITC reasoned that Tenaris' time lag argument is inconsistent

with other record evidence.

> Under Tenaris'[] time lag argument, underselling by cumulated subject
> imports should have decreased earlier in the period, when spot market
> prices fell, and significantly increased later in the period, when market
> prices increased dramatically.  Instead, the record shows that the rate of
> cumulated subject import underselling was fairly consistent from 2019
> to 2021, rising only slightly from 55.9[%] of quarterly comparisons in
> 2019 to 57.1[%] of quarterly comparisons in 2020 and to 60.4[%] of
> quarterly comparisons in 2021.  For all these reasons we do not view
> Tenaris' time lag methodology as a reliable means of analyzing price
> competition by cumulated subject imports in the U.S. market.

Views at 35 (citing Prusa Analysis; Staff Report at Tables V-6–V-14).  Tables V-6

to V-14 provide price data for products 1 to 9 and demonstrate that for most

---

[8]  The declarations state that Robert J. Beltz is employed by the United States Steel
Corporation, a domestic producer of OCTG products, and Brett Mendenhall serves
as the President and CEO of P2 Energy Services, a domestic OCTG distributor.
Decl. Robert J. Beltz; Decl. Brett Mendenhall.

products, prices for OCTG fell in early 2020 when oil and gas prices fell, and then

rose in 2021 and 2022 as oil and gas prices rose.  Staff Report at Tables V-6–V-14.

### 4.    Lost Sales

Tenaris argues that the Commission ignored contrary record evidence that

detracted from the probative value of the market share table on which it relied

when the ITC stated that it found "some evidence that domestic producers lost

sales to subject imports on the basis of price."  Tenaris' Br. at 32.

The ITC stated:

> We also find some evidence that domestic producers lost sales to
> subject imports on the basis of price.  Twenty of 28 responding
> purchasers reported that they had purchased subject imports instead of
> the domestic like product during the [period of investigation].  Eight of
> those 20 reported that subject imports were priced lower than the
> domestic like product, and five of those eight reported that price was a
> primary reason for purchasing of *** short tons of subject OCTG over
> the domestic like product.

Views at 48; see also id. at 48 n.203, 204 (citing Staff Report at Table V-19).

Tenaris argues that the Government attempts to "cure" the ITC's failure to

consider lost sales arguments and evidence with post hoc rationalizations, arguing

that the Government is now claiming to only have relied on Table V-19, rather

than both Table V-18 and Table V-19.  Tenaris' Reply at 11–12.

The ITC's discussion of the evidence regarding lost sales cited to both

footnote 203 and footnote 204 of the Views.  Footnote 203 addressed Tenaris'

concerns regarding the market share table, or Table V-19:

> Tenaris argues that two of the five purchasers reporting that they
> purchased subject imports instead of the domestic like product due to
> price . . . have contradicted this reporting elsewhere in their
> questionnaire responses. . . .  However, their questionnaire responses
> generally corroborate their lost sales reporting.  See *** purchaser
> questionnaire responses at III-23 and III-24 (showing that this firm
> listed price as among its top three purchasing factors, and that it
> characterized price as very important in its purchasing decisions); and
> *** purchaser questionnaire response at III-23 (showing that this firm
> listed "cost" as a factor that is very important in its purchasing
> decisions).

Id. at 48 n.203.  Footnote 204 discussed Table V-18, noting that responding

purchasers reported that between January 2019 and June 2022, the domestic

industry's share of their purchases declined, while the subject import share

of their purchases increased, reflecting a shift in purchases from the

domestic industry to subject imports.  Id. at 48 n.204.

The Government did not address Table V-19 in its brief, and asserts that the

ITC did not focus on the "warning note" in footnote 203 in its lost sales analysis,

but rather on the data in Table V-19, to which no equivalent note was attached.

Def.'s Resp. at 35.  The Government also states that "to the extent that this

footnote reference could be said to render the Commission's lost sales analysis

partially based on a table potentially containing double counting, the

Commission's lost sales finding was tempered appropriately" because of the

inclusion of the word "some" evidence.  Id.

The Court agrees with the Government that the ITC considered the

evidence of lost sales and reasonably determined the adverse price effect of

the subject OCTG.  Table V-18 shows U.S. purchasers' reported purchases

and imports, by firm and source, from January 2019 to June 2022.  Staff

Report at V-39.  Table V-19 shows purchasers' responses to purchasing

subject imports instead of domestic product, by firm, and demonstrates that

five purchasers had confirmed buying a certain amount of short tons of

subject OCTG over the domestic like product based on their lower prices.

Despite the potential double counting, the data relied on by the Commission

in both tables support the ITC's determination.

### 5.    Price Suppression Finding

Tenaris argues that the ITC failed to make a price suppression finding under

19 U.S.C. § 1677(C)(ii), so its price effects analysis is contrary to law and

unsupported by substantial evidence, and should be remanded with instructions for

the Commission to make a price suppression finding.  Tenaris' Br. at 30–31.

The Government contends that the CAFC has held that the Commission's

"consideration" of a statutory factor does not encompass an obligation to make any

ultimate finding regarding that factor.  Def.'s Resp. at 36.

Defendant-Intervenors also assert that there is no statutory requirement to make a price suppression finding.  Def.-Intervs.' Resp. at 33.

Regarding the evaluation of price, 19 U.S.C. § 1677(C)(ii) states that:

In evaluating the effect of imports of such merchandise on prices, the Commission shall *consider* whether—

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(C)(ii) (emphasis added).

The Court concludes that the statute does not require the ITC to make a price suppression finding for its price effects determination.  See, e.g., OCTAL Inc. v. United States, 45 CIT at __, 539 F. Supp. 3d 1291, 1301–16 (2021) (affirming the Commission's finding of significant adverse price effects due to underselling, without a finding that there was significant price depression or suppression); Nucor Corp. v. United States, 414 F.3d 1331, 1339 (Fed. Cir. 2005) (affirming that the Commission complied with statutory requirements of 19 U.S.C. § 1677(C)(ii) even though the Commission did not make a price suppression finding).

The Court agrees with Defendant-Intervenors that Swiff-Train Co. v. United States, 904 F. Supp. 2d 1336 (2013), is distinguishable from this case.  In Swiff-

Train, the Commission did not make an explicit finding of significant price

depression and no finding at all regarding price suppression.  Swiff-Train, 904 F.

Supp. 2d at 1344.  The Court directed the Commission to "make explicit findings

on the *effect of the subject imports* on the price suppression and depression factors,

discussing not only the factors cited in the Commission's Views," but did not

specifically ask the Commission to make a price suppression finding.  Id.

    Further, in the Views, the Commission considered whether subject imports

had significantly suppressed prices for the domestic like product by analyzing the

industry's [cost of goods sold]-to-net-sales.  See Views at 38–39.  Because the

Commission properly considered whether subject imports had significantly

suppressed prices for the domestic like product pursuant to the relevant statutory

authority, the Commission's determination was in accordance with law.

    Accordingly, the Court sustains the Commission's price effects

determination as in accordance with law and supported by substantial evidence.

Based on the record evidence, it was reasonable for the Commission to conclude

that the significant volume of subject imports undersold the domestic like product

causing significant adverse price effects and to not view Tenaris' time lag

methodology as a reliable means of analyzing price competition by cumulated

subject imports in the U.S. market.

## C.    The Commission's Impact Determination

Tenaris asserts that the Commission's determination that the domestic industry was injured by reason of subject imports was unsupported by substantial evidence and not in accordance with law because the Commission failed to evaluate impact within the context of conditions of competition distinctive to the U.S. OCTG industry, the domestic industry began to recover before the petitions were filed, and the Commission relied on qualitative information that included non-subject imports from South Korea.  Tenaris' Br. at 37–48.

The Government and Defendant-Intervenors argue that the Commission's impact determination was supported by substantial evidence and in accordance with law.  Def.'s Resp. at 25–31; Def.-Intervs.' Resp. at 36–48.

### 1.    Legal Standard

The statute directs the Commission to consider several enumerated factors, "among other relevant economic factors," when determining whether an industry in the United States is threatened with material injury by reason of imports of subject merchandise.  See 19 U.S.C. § 1677(F)(i).  Those factors are:

    i. if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy (particularly as to whether the countervailable subsidy is a subsidy described in Article 3 or 6.1 of the Subsidies Agreement), and whether imports of the subject merchandise are likely to increase,

ii. any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

iii. a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

iv. whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

v. inventories of the subject merchandise,

vi. the potential for product-shifting if production facilities in the foreign country, which can be used to produce the subject merchandise, are currently being used to produce other products,

vii. in any investigation under this subtitle which involves imports of both a raw agricultural product (within the meaning of paragraph (4)(E)(iv) ) and any product processed from such raw agricultural product, the likelihood that there will be increased imports, by reason of product shifting, if there is an affirmative determination by the Commission under section 1671d(b)(1) or 1673d(b)(1) of this title with respect to either the raw agricultural product or the processed agricultural product (but not both),

viii. the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

ix. any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale

for importation) of the subject merchandise (whether or not it is actually being imported at the time).

Id. The Commission shall consider the factors as a whole when making its determination, and the "presence or absence of any factor . . . shall not necessarily give decisive guidance with respect to the determination." Id. at § 1677(F)(ii).

## 2.    Conditions of Competition

Tenaris argues that the Commission: (1) failed to evaluate the impact of subject imports within the context of conditions distinctive to the U.S. OCTG industry, as required by statute; and (2) erroneously attributed the positive health of the industry in interim 2021 to post-petition effects and placed less weight on the interim period data that showed the domestic industry had recovered and was performing well consistent with the changing market conditions. Tenaris' Br. at 37. Tenaris contends that the Commission found a "causal nexus between cumulated subject imports and the domestic industry's weak performance relative to the strong growth in apparent U.S. consumption from 2020 to 2021," and failed to account for conditions of competition during the period of investigation in assessing the cause of any harm to the domestic industry and its improvement in interim 2022. Id. at 38. Tenaris argues that the record evidence does not support a causal nexus between the subject imports and the domestic industry's performance because of: (1) the impact of the Russia/Saudi oil supply war and COVID-19

pandemic; (2) supply constraints, such as inventory overhead, HRC prices, and labor shortages; and (3) Tenaris' role in the U.S. OCTG market and intra-industry competition.  Id. at 38–44.

The Government states that substantial evidence supports the Commission's determination that cumulated subject imports had a significant impact on the domestic industry.  Def.'s Resp. at 38–47.  Defendant-Intervenors assert that the Commission's Views reasonably addressed and rejected all three arguments.  Def.-Intervs.' Resp. at 36.

### a.    Supply and Demand

Tenaris contends that the Commission failed to address the Russia/Saudi oil supply war and de-emphasized COVID-19 in assessing the impact of subject imports, dismissed evidence of supply constraints, and erroneously considered only inventories, rather than the combination of inventories, high HRC prices, and labor shortages, in supply constraint.  Tenaris' Br. at 38–39.

The Government argues that the Commission comprehensively addressed the effects of all factors, including the Russia/Saudi price war on U.S. OCTG demand during the period of investigation, by evaluating the trends throughout the period of investigation in each of the following OCTG demand indicators: (1) apparent U.S. consumption, (2) active U.S. rig count, and (3) U.S. oil and gas prices.  Def.'s Resp. at 39.

The ITC discussed the conditions of competition to inform its analysis of whether there was material injury of subject imports, such as supply and demand considerations.  Views at 27–29.

Regarding demand considerations, the ITC stated that "demand for OCTG is driven by oil and gas prices as well as exploration and production" and "[t]he active U.S. rig count, an indicator of oil and gas production in the United States, decreased from January 2019 to an historic low in August 2020."  Id. at 27 (citing Staff Report at II-19, Table II-5 and Figure II-2).  On Page II-19 of the Staff Report, the Commission recognized the dispute over oil prices and production between Saudia Arabia and Russia, as well as the COVID-19 pandemic, as demand determinants.  Staff Report at II-19.

> Over the course of 2019, OCTG demand declined due to a dispute over oil prices and production between Saudi Arabia and Russia.  Then, at the onset of the COVID-19 pandemic in early 2020, oil and gas production plummeted as oil prices even briefly turned negative. . . . However, multiple factors (including rising inflation and U.S. sanctions due to the Russian-Ukraine war) led to rising oil and natural gas prices in late 2021 and early 2022, in turn leading to more oil and gas exploration and production.

Id.  The Commission also discussed that the active oil and gas rig count generally decreased from January 2019 to August 2020, when it reached historic lows, and then began to recover through the summer of 2022 while remaining more than 25% below early 2019 levels.  Id.

Regarding inventory overhang, Tenaris argues that record evidence

confirmed that the significant inventory held by U.S. distributors prevented them

from placing orders with U.S. producers and impeded the domestic industry's

ability to recover.  Tenaris' Br. at 39.  The ITC addressed this argument and was

unpersuaded by Tenaris' argument that the market share shift was caused as

distributors drew down their "inventory overhangs" in lieu of placing orders with

domestic mills during the period of investigation and thus delayed the "re-

activation of domestic OCTG production."  Views at 45.  Further, the ITC

explained that:

> [A]ny such inventory overhang would not explain why the 32.2 percent
> increase in apparent consumption from 2020 to 2021, unmet by existing
> inventories, was satisfied by increased subject imports rather than
> domestic producers.  Second, inventory data . . . indicates that monthly
> inventory levels of OCTG—which include sourcing from both
> domestic producers and importers—were relatively constant between
> January 2019 and March 2021, with small fluctuations above and below
> a level of about *** net tons.  Thus, these data suggest no "massive"
> draw down of inventories in 2020, as Tenaris describes.

Id.

Regarding HRC prices, Tenaris contends that the Commission ignored the

effect of high HRC prices on welded producers.  Tenaris' Br. at 41.  The ITC

acknowledged Tenaris' argument that the rising domestic HRC prices and labor

shortages constrained domestic supply and necessitated increased subject imports

in 2021.  Views at 46.  The ITC explained that:

> Tenaris has also argued that rising domestic HRC prices and labor shortages constrained domestic supply and necessitated increased subject imports in 2021. Yet, even if increasing HRC prices helped reduce domestic production of welded OCTG, domestic producers of seamless OCTG, which utilize steel billets as their raw material input, were unaffected by changes in HRC prices. Domestic producers of seamless OCTG were fully capable of serving the increase in OCTG demand from 2020 to 2021 in light of their low rate of capacity utilization . . . .

Id.

Regarding labor shortages, Tenaris asserts that the Commission dismissed Tenaris' evidence regarding its struggles to hire workers during the period of investigation and instead relied on Petitioner's self-serving statements regarding their ability to hire employees. Tenaris' Br. at 41. The Court observes that the ITC reasonably relied on witness testimony, rather than "self-serving" statements to make its determination. In the Views, the ITC stated that:

> Contrary to Tenaris' argument that labor shortages significantly constrained domestic production, responding domestic producers and domestic industry witnesses at hearing indicated that they were capable of hiring as warranted by increased demand for domestic OCTG, and the domestic industry sharply expanded employment in interim 2022, after the filing of the petitions caused subject imports to compete less aggressively in the U.S. market.

Views at 46–47 (citing Staff Report at II-13; USITC Hearing Tr. at 67–68).

### b. Investment and Intra-Industry Competition

Tenaris argues that the Commission failed to consider Tenaris' role in the U.S. OCTG market and intra-industry competition, such as its Rig Direct program,

and failed to address record evidence when discussing intra-industry competition. Tenaris' Br. at 43–44.

The ITC did not fail to consider Tenaris' role in the U.S. market and sufficiently addressed record evidence.  In the Views, the ITC was unpersuaded by Tenaris' argument that intra-industry competition explains any injury to the domestic industry and stated that intra-industry competition could not explain the domestic industry's loss of market share to subject imports from 2020 to 2021. Views at 47.  Further, in Tenaris I, this Court addressed Tenaris' "Rig Direct" program, which Tenaris argued as the reason for the shift in market share and the increase in Tenaris' market share.  Tenaris I, 48 CIT at __, 698 F. Supp. 3d at 1308; see Tenaris' Br. at 22–23.  The Court held that, based on the record evidence, the ITC considered Tenaris' "Rig Direct" program in assessing possible factors that attributed to the shift in market share toward cumulated subject imports and that the ITC's determination that the "Rig Direct" program was not a cause of the loss of domestic market share was supported by substantial evidence.

### 3.    Domestic Industry's Recovery

Tenaris also argues that the Commission should have given full weight to the evidence of the domestic industry's recovery, rather than ignoring record evidence that improvements in the domestic industry's condition occurred before the filing of the petition.  Tenaris' Br. at 44–47.

Consol. Court No. 22-00344                                                Page 61

The Commission did not fail to fully consider the evidence of the domestic

industry's recovery.  In the <u>Views</u>, the ITC stated that:

> We find it instructive that the domestic industry was able to improve its
> performance markedly in interim 2022 compared to interim 2021 after
> the filing of the petitions in October 2021.  As discussed above, subject
> imports competed less aggressively in the U.S. market after the filing
> of the petitions, losing *** percentage points of market share as the
> domestic industry gained 0.6 percentage points of market share in
> interim 2022 compared to interim 2021.  Consequently, the domestic
> industry was able to more fully capitalize on the 70.6 percent increase
> in apparent U.S. consumption in interim 2022 compared to interim
> 2021 and improved its performance by nearly every measure between
> the interim periods.

<u>Views</u> at 43.  Further, the ITC considered 2021 trends and observed that "the

industry's production, employment, and financial performance remained weaker in

2021 than would have been expected in light of the strong increase in demand."

<u>Id.</u>  The Court also does not find Tenaris' prior determinations for the proposition

that improvements in industry performance across interim periods support a

finding of no adverse impact to be persuasive.  <u>See</u> Tenaris' Br. at 47 (citing

<u>Silicomanganese from Australia</u>, USITC Pub. 4600, Inv. No. 731-TA-1269 (Final)

(Apr. 1, 2016); <u>Greenhouse Tomatoes From Canada</u>, USITC Pub. 3499, Inv. No.

731-TA-925 (Final) (Apr. 1, 2002)).  These prior determinations do not provide

that the Commission has an established practice to always treat interim period

improvements as evidence of adverse impact.

Therefore, the Commission's impact determination was in accordance with law and supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court concludes that the ITC's determinations regarding the cumulation of subject imports, volume, price effects, and impact are in accordance with law and supported by substantial evidence.  Therefore, the Commission's <u>Final Determination</u> is sustained.

Judgment will be entered accordingly.

    /s/  Jennifer Choe-Groves
Jennifer Choe-Groves, Judge

Dated:   June 20, 2025
     New York, New York